JIANG SHUNZHE, et al., Plaintiffs,

v.

DAEWOOSA SAMOA, LTD. and KIL-SOO LEE, Defendants.

---

NGUYEN THI NGA, et al., Plaintiffs,

v.

DAEWOOSA SAMOA, LTD., KIL-SOO LEE,
TOURISM COMPANY 12, and IMS, et al., Defendants,

and

TOURISM COMPANY 12, Cross-Claimant/Counterdefendant,

v.

DAEWOOSA SAMOA, LTD. and KIL-SOO LEE,
Cross-Defendants/Counterclaimants,

---

NEW STAR TRADING COMPANY, LTD.,
Plaintiff/Counterdefendant,

v.

DAEWOOSA SAMOA, INC., and KIL-SOO LEE,
Defendants/Counterdefendants.

---

AMERICAN SAMOA POWER AUTHORITY,
SEUNG KYU MOON, IN SAENG LEE, JEIL VENTURES CO.,
LTD., and SAMOAN EMPLOYEES, Intervenors.

---

AMERICAN SAMOA GOVERNMENT, Necessary Party.

High Court of American Samoa
Trial Division

CA No. 68-99
CA No. 133-99
CA No. 93-00

Before RICHMOND, Associate Justice, and LOGOAI, Chief Associate Judge.

Counsel: For Vietnamese Plaintiffs, Virginia L. Sudbury and Christa Tzu-Hsiu Lin
For Chinese Plaintiffs, Afoa L. Su`esu`e Lutu and Deanna Sanitoa
For Plaintiff/Counterdefendant New Star Trading Company, Ltd., Marshall Ashley
For Intervenor American Samoa Power Authority, Roy J.D. Hall, Jr.
For Intervenors Seung Kyu Moon and In Saeng Lee, *Pro* Se
For Intervenor Jeil Ventures Co., Ltd., Charles V. Alai`ilima
For Necessary Party American Samoa Government, Henry Kappel, Legal Counsel to the Governor
For Defendants/Cross-Defendants/Counterclaimants Daewoosa Samoa, Ltd. and Kil-Soo Lee, Aitofele T. Sunia and Marie A. Lafaele
For Defendant/Cross-Claimant/Counterdefendant Tourism Company 12, Paul F. Miller
For Defendant IMS (no appearance)

OPINION AND ORDER

A class of immigrant workers from China in CA No. 68-99 ("the Chinese workers") filed suit against defendants Daewoosa Samoa, Ltd. ("Daewoosa Samoa") and Kil-Soo Lee ("Lee") for allegedly breaching terms of their employment contracts, and committing other civil wrongs, all stemming from their employment at the Daewoosa Samoa garment factory in American Samoa.

Later, a class of immigrant workers from Vietnam in CA No. 133-99

("the Vietnamese workers") filed suit against Daewoosa Samoa and Lee for allegedly violating the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C.A. §§ 201-219,[1] breaching terms of their employment contracts, and committing other civil wrongs, in connection with their employment at the same Daewoosa Samoa facility. Initially, the American Samoa Government ("ASG") and other individuals were also named as defendants in CA No. 133-99, but they were dismissed from the action at various junctures during the pretrial proceedings.

CA No. 68-99 and CA No. 133-99 were consolidated in due course. Still later, defendants IMS[2] and Tourism Company 12 ("TC12") were added, with the court's permission, as defendants in CA No. 133-99.

Plaintiff New Star Trading Company, Ltd. ("New Star") filed a separate action, CA No. 93-00, against Daewoosa and Lee to recover certain property allegedly owned by New Star, but in the possession of Daewoosa Samoa and Lee. Daewoosa Samoa and Lee counterclaimed for monetary damages in this action. We consolidated CA No. 93-00 with CA No. 68-99 and CA No. 133-99, and permitted intervention by the American Samoa Power Authority, Seung Kyu Moon, In Saeng Lee, Jeil Ventures Co., Ltd., and the Samoan employees, and joinder of necessary party ASG, in an effort to resolve all issues involving Daewoosa Samoa and Lee in the same bundle. These additional procedural events, however, took place after the trial of CA No. 68-99 and CA No. 133-99. We therefore made it clear that in the absence of an unexpected compelling reason, we would not necessarily issue our decisions in CA No. 93-00 and on the intervenor and necessary party issues simultaneously with our decision in CA No. 68-99 and CA No. 133-99. As it turned out, we actually disposed of CA No. 93-00 and the intervenor and necessary party claims earlier in this manner.

On January 10, 2000, under the American Samoa injunction laws, A.S.C.A. §§ 43.1301-.1313, the U.S. Secretary of Labor filed a suit in this court, CA No. 2-00, against Daewoosa Samoa and Lee to permanently enjoin Daewoosa Samoa and Lee from violating FLSA §§ 206, 207, 211(a)(1), and 215(a)(1), (a)(2), and (a)(5). This action was brought in connection with the investigation by the Department of Labor of nonpayment of minimum and overtime wages owed with respect to 71 of the Daewoosa Samoa foreign workers. IMS and TC12 were not parties. Pursuant to the parties' stipulation, Daewoosa and Lee were preliminarily

[1] All citations in this opinion and order to FLSA generally and to specific FLSA sections include reference to 29 U.S.C.A.

[2] Though joined by this name, IMS is actually the acronym for International Manpower Supply. IMS will be identified by the acronym throughout this opinion and order.

enjoined on February 10, 2000, from violating the FLSA as set forth by the terms of a proposed consent judgment signed by the parties on August 2, 1999, and filed with the stipulation. Since then, the action has stood still and remains unresolved. The impact of CA No. 2-00 on CA No. 68-99 and CA No. 133-99 is discussed below.

## Introduction

The combined CA No. 68-99 and CA No. 133-99 cases are made more complicated by the diverse language and culture of the parties and witnesses involved. The plaintiffs originate from either China or Vietnam. Daewoosa Samoa's owners hail from Korea. Contract performance took place in American Samoa. However, the negotiation and finalization of the employment contracts transpired in either China or Vietnam.[3]

The social barriers between the parties was evident before and during trial. Throughout the proceedings, testimony was, as became necessary or appropriate, translated into five different languages, English, Samoan, Korean, Vietnamese, and Chinese. For the most part, amateur translators were necessarily employed, and unsurprisingly, the translations were difficult and at times ineffective.

Counsel did little to abridge this complexity. The pretrial maneuvering was intricate and exhaustive. During the trial, perhaps one of lengthiest in the recent history of this court, they complicated our fact-finding mission by introducing heaps of unmarked, seemingly irrelevant evidence, leaving us with the task of filtering through and searching for relevant documents and records amid these piles. Nonetheless, we were ultimately able to assemble the relevant facts—and apply applicable legal principles to them.

The major entities on the defense side of this case include two corporations, two Vietnamese employment-recruiting agencies, and several individuals. Both corporations are similarly named. Daewoosa Samoa, which was incorporated in American Samoa, was the operational employer of the Chinese workers and the Vietnamese workers. U.S.A. Daewoosa, Ltd. ("Daewoosa USA"), which was established in Korea, appeared as the named employer to the Vietnamese workers' employment contracts. Individuals affiliated with these corporations include Lee, a Korean national, the primary owner and apparent manager of Daewoosa Samoa, and Um Sang Hee ("Hee"), a Korean national, the president of Daewoosa USA, shareholder and vice-president of

---

[3] The contracts were initially written in either English or Vietnamese, and accompanied by their Vietnamese or English translations, respectively.

Daewoosa Samoa, and primary negotiator for and signatory to the Vietnamese workers' employment contracts.

IMS and TC12 are Vietnamese government-connected agencies arranging overseas employment of Vietnamese nationals. They assisted in recruiting, negotiating, and implementing the Vietnamese workers' employment with Daewoosa Samoa. TC12 is organized under a general directorate, which is governed by the government of Vietnam. Because both IMS and TC12 operate Vietnamese labor export organizations, all of their labor contracts must be approved and authorized by the Vietnam Department of Administration of Foreign Employed Labour Force, the Vietnam government agency empowered to oversee all foreign labor contracts. Nguyen Viet Chuyen ("Chuyen"), a Vietnamese national employed by TC12, became charged with supervisory responsibility over the IMS and TC12 Vietnamese workers at the Daewoosa Samoa factory.

### Procedural History

The complaints in CA No. 68-99 and CA No. 133-99 were filed, respectively, on July 2, 1999 and December 23, 1999. After the complaint was filed in CA No. 133-99, this action became a tangled web of preliminary filings and orders. On December 29, 1999, the court issued a stipulated preliminary injunction preventing Daewoosa Samoa: (1) from removing or causing the removal of the Vietnamese workers from American Samoa or from otherwise disturbing the Vietnamese workers; and (2) from terminating any immigration sponsorships of the Vietnamese workers without affording them opportunities to consult with the Law Office of Virginia Sudbury and to have a hearing before ASG's Immigration Board.

On January 27, 2000, the Vietnamese workers requested class action certification under T.C.R.C.P. 23, in connection with their amended complaint filed on January 14, 2000 and certain proposed amendments to the amended complaint. On February 24, 2000, we ruled out certification of a Rule 23 class action under the purview of the FLSA, but left open the certification as to non-FLSA claims.[4] In the same ruling, we granted the workers leave to amend their complaint to allege their statutory claims under the FLSA.

On April 11, 2000, we consolidated CA No. 68-99 and CA No. 133-99, and certified the class action status of all the workers' claims alleged in these cases, except those rooted in the FLSA, which were later amended. Accordingly, on January 12, 2001, counts 6 and 7 were amended to allege violations of FLSA §§ 206(a) and 207(a)(1), respectively, and

---

[4] The order slightly amended an earlier order dated February 22, 2000.

147

counts 13 and 19 were amended to allege violations of FLSA § 215(a) (3). On January 17, 2001, approximately 168 Vietnamese workers filed signed consents to the FLSA litigation.

Certain named defendants were dismissed and added in CA No. 133-99. On January 25, 2000, ASG was dismissed as a party defendant. We dismissed as defendants Moon Seung Kyu on February 18, 2000, and Mary and Togiola Tulafono on April 4, 2000. Jo Heung Soo was dismissed as a defendant on February 6, 2001. On December 15, 2000, IMS and TC12 were added as defendants with the court's permission. An amended complaint reflecting this addition of parties was filed, and on December 21, 2000, TC12 answered and cross-claimed against Daewoosa Samoa for contractual specific performance and monetary damages. IMS did not answer or otherwise in any manner appear or participate in the proceedings of CA No. 133-99.

Since the filing of CA No. 133-99, the Vietnamese workers called upon the court numerous times to adjudicate pretrial contempt filings against Daewoosa Samoa and Lee for violating the court's orders and harassing the Vietnamese workers because of the their involvement in this lawsuit.

On February 18, 2000, we held Daewoosa Samoa and Lee in contempt for attempting to withhold the identification cards of one of the Vietnamese workers and for threatening to send five of them back to Vietnam unless they returned to work. We also required Daewoosa Samoa and Lee, or their agents: (1) to return passports to the Vietnamese workers; (2) to not confiscate their identification cards when the workers leave the compound; (3) to provide copies of Immigration Board decisions affecting the workers to their attorneys; and (4) to furnish the workers nutritious meals.

On April 4, 2000, we held Daewoosa Samoa and Lee in contempt for attempting to send at least one more of the Vietnamese workers out of the territory without consulting their attorney in compliance with the December 29, 1999, preliminary injunction. Additionally, we enjoined Daewoosa Samoa and Lee from preventing any of the Vietnamese workers from working at Daewoosa Samoa because of their involvement as plaintiffs in this lawsuit.

On July 14, 2000, we enjoined Daewoosa Samoa and Lee: (1) from imposing overcrowded living conditions on the Vietnamese workers, including but not limited to situations in which any of the workers must share single beds; (2) from pressuring any of the workers to terminate or in any other manner prevent or discourage them from prosecuting these actions; and (3) from in any manner preventing the workers from exercising their choice of associates in American Samoa outside of

Daewoosa Samoa's premises.

On September 22, 2000, we ordered Daewoosa Samoa and Lee to immediately put back to work 38 of the Vietnamese workers. Daewoosa and Lee listed these 38 workers in a letter to ASG's Immigration Board, citing unsubstantiated reasons for returning them to Vietnam. On September 26, 2000, we ordered Daewoosa Samoa and Lee to return all of the Vietnamese workers to work, including specifically eight workers named as "troublemakers" and prevented from working by Lee because they attended the September 22, 2000, court hearing, no later than the following Monday, October 2, 2000.

On October 23, 2000, we denied the motion by Daewoosa Samoa and Lee to terminate several of the Vietnamese workers who were pregnant, in the absence of any established safety or other legitimate concern, and ordered that the pregnant workers be returned to appropriate work, with retroactive pay from October 2, 2000. We further held Daewoosa Samoa and Lee in contempt for failing to heed earlier orders.

On December 14, 2000, we issued orders on several matters. Included were: (1) directions to Daewoosa Samoa and Lee to fully pay the wages, less authorized tax deductions, of the Vietnamese workers for the period from October 2 to November 28, 2000, without any limitation on other unpaid wage obligations; (2) directions to Daewoosa Samoa and Lee, in accordance with their commitment on December 7, 2000, to arrange and pay for transportation of the Vietnamese workers desiring to return to Vietnam, the first 35 within three weeks, and the remaining workers thereafter in groups of varying size at reasonable intervals; (3) permission by stipulation to preserve the testimony of returning Vietnamese workers by pretrial videotaped depositions; and (4) denial as impractical of a requested order preventing Daewoosa Samoa and Lee from contacting the Vietnamese workers.

The requested no-contact order was prompted by the altercation between several Samoan employees and Vietnamese workers on November 28, 2000. This event arose out of arguments between Daewoosa Samoa's floor manager and the Vietnamese workers who were not working and Lee's directions to the floor manager to remove the workers. One of the Vietnamese workers, Truong Thi Le Quyen, lost an eye during the ensuing melee. We did not make detailed findings on this event and responsibility for it because the evidence presented was inconclusive and the liability issue was not then before us. Clearly, however, many of the Vietnamese workers feared returning to work after this incident and were motivated to return to Vietnam.

On January 10, 2001, we granted the Vietnamese workers' application to

establish a receivership over Daewoosa Samoa, based on its apparent financial instability, to secure Daewoosa Samoa's remaining assets, oversee the provision of food to the workers and their repatriation, and evaluate Daewoosa Samoa's ability to continue business operations. On January 12, 2001, we appointed Southwest Marine of Samoa, Inc. as the receiver.

When the need no longer existed, we terminated the receivership and discharged the receiver on June 27, 2001. At that time, the garment factory had been inoperable since January 2001 and had no prospect of resuming operations, most of Daewoosa Samoa's immigrant workers had departed American Samoa, and ASG had completed an initial inventory of property on the Daewoosa Samoa premises and agreed to assume custody of and security responsibility for the factory compound and property located there.

Well after class certification, in August of 2000, one of the representative workers, Nu Thi Nga, who was recruited by IMS and arrived in American Samoa on March 8, 2000, died from causes unrelated to this lawsuit.[5] Although the Vietnamese workers did not seek a substitute for the deceased representative plaintiff in accordance with T.C.R.C.P. 25(a), this cause of action with regards to the remaining named and unnamed Vietnamese workers was not extinguished, because class certification had been court approved prior to the representative plaintiff's death, and other named representative plaintiffs remained.[6]

Finally, on January 18, 2001, trial began and, after 18 trial days, concluded on February 22, 2001. Counsel Virginia L. Sudbury and Christa Tzu-Hsiu Lin for the Vietnamese plaintiffs, Marie A. Lafaele for Daewoosa Samoa and Lee, and Paul F. Miller for TC12 were present throughout the trial. Counsel Afoa L. Su`esu`e for the Chinese plaintiffs was present at proceedings immediately pertaining to his clients. The remaining counsel did not attend the trial. IMS was not represented by counsel and did not present any evidence.

## Facts

[5] Nu Thi Nga died together with another Vietnamese worker, Dung Kim Thi Vu. However, at the time of her death, Dung Kim Thi Vu was not a representative plaintiff in this lawsuit.

[6] Generally, when a class action has been certified, it acquires a legal status separate from the interest of the named representative plaintiff. *See Sosna v. Iowa*, 419 U.S. 393, 399 (1975); *see also Jones v. Jones*, 148 F.R.D. 196 (W.D.KY. 1993) (allowing the unorthodox pursuit of a class action complaint although representative plaintiff died a year before class certification).

A. Workers' Recruitment

This saga apparently originated in Korea. Events then revolved around travel to China and Vietnam, and all the while traversing back and forth between these countries and American Samoa.

Sometime in September 1998, Lee traveled to China and enlisted workers to do miscellaneous jobs at the Daewoosa Samoa garment manufacturing facility in American Samoa. A total of 18 Chinese nationals, now comprising the Chinese workers, were enlisted. They arrived in American Samoa in two separate groups. An initial group of 13 arrived in October 1998, and began working on October 14, 1998. The remaining five arrived sometime in February 1999, and began working on March 1, 1999.

At about the same time, Lee sought employees from Vietnam to work at the Daewoosa Samoa garment factory. He specifically authorized Hee, president of Daewoosa USA, to enter into contracts on behalf of Daewoosa Samoa for this purpose. Hee, in turn, engaged IMS and TC12 to assist in recruiting Vietnamese nationals to work for Daewoosa Samoa. Contract negotiations went back and forth between the parties. IMS and TC12 representatives either traveled to Daewoosa USA headquarters in Korea or Daewoosa USA representatives, Hee and Song Dae Lee, traveled to Vietnam to negotiate and finalize the terms of the contracts for Vietnamese nationals, most of whom now comprise the Vietnamese workers. Daewoosa USA representatives, with IMS and TC12 representatives, screened the prospective Vietnamese applicants identified by IMS and TC12. They eventually recruited more than 250 Vietnamese nationals to work at the Daewoosa Samoa garment factory. Although most of the Vietnamese workers were recruited by either IMS or TC12, approximately 6 Vietnamese workers were independently recruited by Daewoosa Samoa and Lee.

The Vietnamese workers arrived in American Samoa in groups throughout the years 1999 and 2000. Groups of IMS recruited workers arrived on February 8, 1999, March 8, 1999, May 14, 1999, and June 12, 1999. TC12 recruited workers arrived in groups arriving on July 15, 1999, July 19, 1999, July 22, 1999, July 26, 1999, August 3, 1999, August 10, 1999, August 24, 1999, October 1, 1999, January 1, 2000, May 18, 2000, and May 25, 2000. The independently recruited Vietnamese workers arrived on December 20, 1999.

B. Employment Contracts

Both the Chinese workers and Vietnamese workers entered into employment contracts with their prospective employers. Upon their

151

arrival in American Samoa, each of the Chinese workers executed contracts with Daewoosa Samoa, which provided eight hour workdays and $390.00[7] in monthly basic wages. The contracts also provided Daewoosa Samoa would supply room and board, for which the workers were required to pay a monthly fee of between $100.00 to $150.00.

The Vietnamese workers initially signed individual contracts to work at Daewoosa Samoa with either their respective recruiting agency in Vietnam, or Daewoosa USA. Then, when the workers arrived at the Daewoosa Samoa factory, Daewoosa Samoa attempted to have each Vietnamese worker sign an altered contract. Each IMS recruitee signed a contract with IMS ("IMS-worker contracts"), and each TC12 recruitee executed an employment contract with TC12 ("TC12-worker contracts"). Each independent worker also entered into individual contracts to work at Daewoosa Samoa as evidenced by an employment contract between one of the independent workers, Ha Thi Huong, and Daewoosa USA ("independent worker-Daewoosa USA contracts"). Another set of contracts that outlined the terms of the TC12 recruited Vietnamese workers' employment, was executed by TC12, and Hee, on behalf of Daewoosa USA ("TC12-Daewoosa USA contracts").

Two TC12-Daewoosa USA contracts were entered. The first contract, dated June 6, 1999, concerns the recruitment of 150 "machinists." The other, dated July 15, 1999, involves the employment of 100 "machinists."

Although Hee's stamped signature appears on the TC12-Daewoosa USA contracts, and Hee occupied the table at which the formal execution of the contracts took place, Hee incredibly repudiates the use of her signature stamp, or in any way consenting to the agreements. In addition, Hee incredibly disavows any relationship between Daewoosa USA and Daewoosa Samoa. The close affiliation of both corporations was clearly established at trial.

Daewoosa USA directed substantial sums of money, including one payment of at least $20,000, in investments and loans to Daewoosa Samoa. Furthermore, Daewoosa USA acted as the conduit for the Vietnamese workers' employment, including transferring the workers' initial fees received from IMS and TC12 to Daewoosa Samoa. Also, several documents, including the TC12-Daewoosa USA, the independent worker-Daewoosa USA contracts, and Hee's business card, list Daewoosa USA with Daewoosa Samoa's American Samoa address, telephone number, and fax number.

---

[7] This amount and all amounts stated below are expressed in U.S. money terms.

The terms of the IMS-worker, TC12-worker, independent worker-Daewoosa USA, and TC12-Daewoosa USA employment contracts state that the employer will provide the workers' with free suitable housing and food. The TC12-Daewoosa USA, and the independent worker-Daewoosa USA contracts further allowed for continuous compensation for the workers when work was interrupted for no fault of their own. The IMS workers understood their contracts to include the continuous wage provision.

The TC12-Daewoosa USA contracts further provided an "arbitration" clause. However, rather than the customary interpretation of arbitration, it was understood that the clear meaning of the term "arbitration," translated from a Vietnamese writing, was judicial resolution of any contract dispute.

At some time after the Vietnamese workers arrived in American Samoa, Daewoosa Samoa attempted to execute yet another contract with each of the Vietnamese workers ("Daewoosa Samoa-worker contracts"). According to Daewoosa Samoa and Lee, the Daewoosa Samoa-worker contracts, written only in English, eliminated Daewoosa Samoa's responsibility to pay for the workers' food and lodging, and to compensate the Vietnamese workers when work was interrupted. Some members of the earlier arriving IMS groups had the benefit of a Vietnamese translation of the new contracts and refused to sign them. However, without having any translation in their language, members of the subsequently arriving Vietnamese groups executed the new contracts.

While the workweeks for the Vietnamese workers were similarly expressed in their contracts as 40-hour workweeks, the monthly salaries of some of the Vietnamese workers initially differed. The TC12-worker contracts, and independent worker Daewoosa USA contracts guaranteed each employee monthly wages of $408.00 per month, whereas the IMS-worker contracts provided monthly wages at $390.00 per month. Apparently, these two amounts were premised upon the parties' mistaken belief that the amounts complied with lawful U.S. minimum wage applicable to American Samoa. In any event, when the IMS recruits received their first paychecks their earnings reflected basic monthly wages of $408.00 rather than $390.00.

The Chinese workers' contracts and Vietnamese workers' contracts were similar in some respects. Overtime wages for both the Chinese workers and Vietnamese workers were calculated at 150% of their regular wages and then subjected to a varying deduction. The TC12-Daewoosa USA contracts contain reference to a 50% deduction from the Vietnamese workers' overtime wages to cover items identified as board, lodging, and security. In practice, however, overtime deductions were applied to the

foreign Daewoosa Samoa workers across the board. The amount of the overtime deduction was inconsistent and wide-ranging from 40% to 60% of the workers' overtime pay, resulting in irregular and substantially reduced overtime wages.

It was agreed that payroll deductions of 7.65% and 2% would be taken from the workers wages for the mandatory payment of U.S. Social Security contributions and American Samoa income taxes, respectively. Although Daewoosa Samoa and Lee withheld these amounts from the workers' salaries, they failed to pay the withheld contributions to the Social Security Administration, or the withheld taxes to ASG except for a short period beginning in January and ending in May 2000.

Prior to employment, the Chinese workers and Vietnamese workers were required to pay their employers substantial initial fees for various purposes. The Chinese workers each paid Daewoosa Samoa and Lee an initial fee of $7,683. Each of the Vietnamese workers recruited by IMS paid IMS $3,000.00, and those recruited by TC12 paid TC12 $4,000.00, portions of which IMS and TC12, in turn, transferred to Daewoosa Samoa and Lee. Each of the independently recruited Vietnamese workers paid Daewoosa Samoa and Lee, through an independent employment recruiter, approximately $5,000. The monies paid by the workers were said to cover government fees, airfare to American Samoa, a security deposit, and ASG immigration and employment fees. The workers borrowed money for this purpose. At least one Vietnamese worker sold her home to make the requisite payment.

Out of the fees that TC12 collected from the Vietnamese workers, it transferred approximately $450,000.00 to Daewoosa Samoa and Lee for the workers' deposit, immigration fees, and other miscellaneous fees. Two hundred and fifty thousand dollars was specifically earmarked for the workers' immigration bonds. However, ASG allowed Daewoosa Samoa and Lee to post a lump-sum immigration bond for all of the workers in the total amount of $10,000.

C. Retention of Passports, and ID Cards

Upon their arrival in American Samoa, or soon thereafter, the Chinese workers were required to relinquish their passports and airline tickets to Lee. Similarly, the Vietnamese workers tendered their travel documents and tickets to an IMS or TC12 representative, if they traveled with one, or to Lee, if they did not. Lee allegedly took these documents for the purpose of immigration processing. However, even after the workers' immigration papers were completed and their identification cards were issued, Lee continued to retain their travel documents. Up until the time of trial, Lee had not returned at least three Vietnamese workers'

passports.

A curfew was enforced on all the Chinese workers and Vietnamese workers. On weekdays, the workers were required to be in the compound before 9:00 p.m. On weekends, the curfew was slightly extended to 10:00 p.m. Apparently, the curfew was initiated upon the advice of Daewoosa Samoa's former counsel, who also happened to be the head of the *aumaga,* or village police, of the nearby village of Nu'uuli, to have workers return to the compound by these times, corresponding with the nightly Nu'uuli village *sa,* or curfew. However, at least some workers who violated the curfew were unexpectedly kicked, slapped, or punched by Daewoosa Samoa's security guards upon returning to the compound.

The workers' egress from and ingress to the compound was further limited by a Daewoosa Samoa policy requiring each worker to leave their ASG issued identification cards, formally named certificates of alien registration receipt cards, at the compound's main gate before leaving. As a result, workers remained within the compound fearful of traversing beyond its perimeters without their ID cards on their person, an American Samoa immigration law requirement.

### D. IMS and TC12 Supervision of the Vietnamese Workers

While IMS and TC12 remained distinctly responsible for their respective recruits, during the summer or fall of 1999 these agencies jointly engaged Chuyen, who had initially been hired by TC12, to supervise all the Vietnamese workers. In reality, Chuyen served as more than a mere supervisor of the employees.

In an October 23, 2000 letter, the Vietnam government's Department of Administration of Foreign Labour Force confirmed to Lee that Chuyen served as both the IMS and TC12 representative in charge of managing the workers sent by both IMS and TC12 to American Samoa. The letter also delegated Chuyen the authority to discuss and settle the workers' legal disputes with Daewoosa Samoa and Lee.

Chuyen did more than merely oversee the Vietnamese workers. He was also given broad authority to discipline the workers, including sending regular reports of the workers' comportment with management policies to IMS and TC12. His reports recommended adverse actions against the workers, including employment suspension or termination. Chuyen's reports clearly kept IMS and TC12 appraised of all that transpired in American Samoa regarding the Vietnamese workers, including the filing of this lawsuit. At one point in April 2000, TC12 wrote directly to the Vietnamese workers, instructing them to drop this lawsuit. IMS and

TC12 also threatened workers or their Vietnam based families with penalties if their protests continued.

Chuyen also served as the communicator between the Vietnamese workers and Lee. All of Lee's instructions to the workers were translated through Chuyen. In addition, Chuyen performed other managerial-type duties for Daewoosa Samoa, such as distributing the Vietnamese workers' paychecks.

## E. Living Conditions

The living quarters of the Chinese workers and Vietnamese workers consisted of approximately eight rooms with an estimated holding capacity of 36 people to each room. The typical room was furnished with two-tiered bunk beds equipped to hold one person per tier. The bunk beds were aligned close to each other in approximately two rows, which rows were opposite each other. A narrow corridor space was provided between the two rows of beds. At any given time, there were an insufficient number of beds to the number of workers, requiring that two workers share some beds.

Each room was equipped with a shared bathroom facility, consisting of showers and toilets. There were approximately one to two showers, and two to five toilets in each bathroom facility. The showers and toilets were not maintained, and some remained permanently broken. Toilet paper, and hot water were not provided.[8]

Workers testified that the meals prepared by Daewoosa Samoa and Lee were at times barely edible. The food principally consisted of a starch and a type of vegetable, usually cabbage soup. Fresh vegetables and fruits were not provided. Meat and chicken, or similar food, were not regularly provided, but given in only two to three meals a week.

Dr. Heather Margaret, who testified as an expert on behalf of the Vietnamese workers, reviewed the nutritional value of the food served the workers. Dr. Margaret holds an M.D. from the Medical College of Pennsylvania, spent most of her medical career practicing family medicine, or comprehensive health care, and is currently employed at the LBJ Tropical Medical Center. After reviewing menus of Daewoosa prepared foods, Dr. Margaret was unable to form an opinion as to the

---

[8] In 1999, the Department of Labor's Occupational Health and Safety Administration cited Daewoosa Samoa for a number of safety and health violations, including its failure to maintain the men's bathroom facilities, equip the toilets with toilet paper, and provide running hot water, in accordance with federal regulations.

nutritional value of meals because the menus did not provide corresponding portion sizes. However, she did opine that the meals failed to meet U.S. Department of Agriculture intake requirements regarding fresh vegetables and fruits because of the total lack of such foods.

F. Payment of Wages

From the outset, the Chinese workers and Vietnamese workers were paid irregularly, and at times were not paid at all.

To the dismay of the Chinese workers, Lee failed to pay them for several months. Finally, sometime in May 1999, the Chinese workers retained an attorney to assist in getting their back earnings paid. In retaliation, Lee refused to allow the workers back to work. It is unclear what then immediately transpired. However, within two months, seven workers returned to work, and the remaining 11 were sent back to China. An accountant computed the pay still owed to the Chinese workers, deriving the hours worked from the workers' personal diaries or records.

The Vietnamese workers suffered similar experience, all being paid sporadically. However, confusing evidence was adduced at trial regarding the hours that the workers worked, and the payments that they actually received. While an accountant testified as to the Chinese workers' unpaid wages, compiled from the workers' detailed records, the Vietnamese workers did not present a similarly comprehensive accounting of their unpaid wages. The Vietnamese workers' videotaped depositions were admitted into evidence. However, given the lack of any personally kept documentary corroboration, we did not find this evidence very reliable with respect to the number of hours that the workers worked. Also, the videotaped recordings were at times indistinct so that the witnesses' testimonies could not be reliably discerned. Confusion over the Vietnamese workers' payroll was further exacerbated when Daewoosa Samoa and Lee delayed producing the requested payroll summaries.

While the late produced payroll summaries provided individualized payroll information on the majority of the Vietnamese class members, summaries for some IMS and TC12 recruited Vietnamese workers were missing. Furthermore, while it appears that the Vietnamese workers' agreed with Daewoosa Samoa's figures as to the amount of wages already paid the workers, the provided summaries conflicted significantly with the Vietnamese workers' closing argument presentation of the number of regular and overtime hours that they worked. Apparently, the Vietnamese workers' computation of their regular hours was based on their understanding that they were entitled to compensation for periods of

time when they did not work, basically entitling them to salary for the length of their stay in American Samoa. The workers' presentation of the amount of overtime hours worked was less obvious. They presented varying testimonies regarding these hours. Yet, in their closing argument, they utilized the overtime hours recorded by Daewoosa Samoa and Lee to formulate their overtime hours worked, seemingly disregarding their testimonial evidence.

Clearly, there were several periods when the Vietnamese workers did not work. Earlier arriving IMS groups went unpaid for many weeks. By March 27, 1999, tension mounted amongst them, and a confrontation ensued between an uncompromising Lee and a large group of the IMS Vietnamese workers. For two days, March 27 and 28, 1999, the workers refused to work until Lee paid them. In reprisal for striking, Lee refused to feed them. By the third day, Lee provided food and asked them to return to work. The workers refused, insisting that their wages be paid first. When the workers persisted to strike, Lee unsuccessfully attempted to confiscate their ID cards. Insistent that the workers return to work, Lee had the representative workers arrested. They were incarcerated for three days, and eventually returned to Vietnam. It appears that tensions were finally appeased, however, and on April 26, 1999, the Vietnamese workers received their first paychecks of $709.00 for the pay period February 11 through March 27, 1999.

Soon after the Vietnamese workers' March 1999 strike, in May of 1999, the U.S. Department of Labor began investigating the workers' allegations of mistreatment. In September 1999, the Secretary of Labor and Lee reached a settlement, requiring that Daewoosa Samoa and Lee compensate workers for sums of up to $2,274 as back wages due for the period October 13, 1998 to May 13, 1999. However, after releasing the employees' back pay, Lee secretly forced them to return the money. Three Daewoosa Samoa management representatives accompanied at least 20 Vietnamese workers by bus to a local bank to cash their settlement checks. The workers were threatened that they would not be allowed to work if they failed to comply. Four out of the 20 Vietnamese workers relented, and relinquished their cashed earnings back to Daewoosa Samoa. These four were allowed back to work.

Lee continued to restrict the remaining 16 from returning to work until they paid back their settlement proceeds. On December 18, 1999, nine of the 16 workers sought legal advice. Three days later, Lee retaliated and had the nine sent back to Vietnam. By December 21, 1999, all, except one, of the remaining seven returned to work. The one remaining, Nguyen Thi Nga, was not allowed to work until January 29, 2000.

During a brief span, from January through the end of May 2000,

Daewoosa Samoa entered into an agreement with New Star Trading Co., Ltd. and Jakor Trading Co., Ltd., both of Seoul, Korea to manage the factory operations. During their management tenure, the joint management team regularly paid each worker the agreed upon wage of $408 per month.

Soon thereafter, working conditions at the factory rapidly deteriorated. During the month of June 2000, the Vietnamese workers laid idle, as the factory lay dormant because of a lack of materials. Workers were not paid. Work resumed in July and into August 2000, but the Vietnamese workers were still not paid. In September 2000, again there was no work because of a lack of materials. The workers returned to work in October and November 2000. However, the workers' paychecks for these months were for insignificant small amounts.

Throughout the time that the Chinese workers and Vietnamese workers were employed at Daewoosa Samoa, Daewoosa Samoa and Lee deducted various amounts from their salaries. Varying amounts were deducted from the workers' overtime pay. Also, the Chinese workers were charged additional amounts for room and board. Room and board fees were deducted from the Vietnamese workers' wages as well, notwithstanding the Vietnamese workers' contract provision providing that accommodations would be free.

On November 28, 2000, after the tragic melee at the factory that resulted in physical injury to several of the Vietnamese workers, including one employee's loss of an eye, the workers refused to return to work. Weary of endless months of fighting for their basic wages, and frightened of Lee, many of the Vietnamese workers requested that they be returned to Vietnam. Most of the workers departed American Samoa for Vietnam or elsewhere during the period from January to March 2001. Many of the workers returned to their homeland. However, a significant number went to Hawaii and various parts of the continental U.S. under the new federal relief program designed to protect victimized immigrants.

G. Unrelated Death of Two Vietnamese Workers

In August of 2000, Nguyen Thi Nga, and Dung Kim Thi Vu, two IMS recruited Vietnamese workers, who arrived in American Samoa on March 8, 1999, died of drowning during a swimming excursion. Prior to her death, Nguyen Thi Nga remained employed with Daewoosa Samoa. However, as captured in a video taped production of the workers' experiences at the Daewoosa Samoa factory, Dung Kim Thi Vu explained that she voluntarily left Daewoosa Samoa after 20 days of work. She further explained that Daewoosa Samoa paid her $200.00 for this period.

## H. Daewoosa Samoa's Corporate History

Daewoosa Samoa was incorporated in 1994, with its board of directors comprised of Heung Soo Jo as president, Seung Kyu Moon as vice-president and treasurer, and Mary Tulafono as secretary. Lee testified that these three ended their relationship with Daewoosa Samoa at various junctures in 1998 and 1999. Their positions remained vacant until June 2000 when Daewoosa Samoa's articles of incorporation were amended showing the selection of three new board members. Lee replaced Heung Soo Jo as president, Um Sang Hee replaced Seung Kyu Moon as vice-president and treasurer, and Ui Seuk Jung replaced Mary Tulafono as secretary.

It appears that for the most part, Daewoosa Samoa failed to follow corporate formalities. No organizational meeting was held, no bylaws kept, nor board of directors meetings recorded. In fact, no evidence exists that any board meetings actually took place.

The evidence on Daewoosa Samoas financial condition was equivocal at best. According to Lee, he invested $5 million of his own money in the Daewoosa Samoa corporation.[9] Additionally, the company's November 1999 balance sheet showed assets worth more than $8 million. Although TC12 provided a portion of the Vietnamese workers initial fees, several thousands of dollars, either directly or indirectly to Daewoosa Samoa bank accounts in American Samoa, the company's bank records evidenced a pattern of negative funding reflecting the use or misuse of funds from TC12 or other sources.

## Discussion

### I. Jurisdictional Issues

#### A. Class Action and Standing

In our April 11, 2000 order, we allowed these consolidated cases to proceed as a class action, and certified the class pursuant to T.C.R.C.P. 23(b)(3). The certification of the class under T.C.R.C.P. 23(b)(3) is appropriate as the "questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for

---

[9] Although Lee testified that he invested $5 million, no corporate stock was issued to reflect this investment. In fact, the stock was not distributed until June 2000 when a total of $10,000 one-dollar shares of common stock were distributed amongst the corporate directors, namely Lee acquired 6,000 shares, Ui Seuk Jung 2,000, and Hee 2,000.

the fair and efficient adjudication of the controversy." The adjudication of the Chinese workers and Vietnamese workers unpaid wages may necessarily involve somewhat individualized questions as to damages since each worker was employed for varying lengths of time. However, the common questions in this case predominate. The myriad of civil wrongs alleged against Daewoosa Samoa, Lee, TC12, and IMS stem from similar employment at the Daewoosa Samoa facility. The Chinese workers shared the same type of contract. For the most part, the Vietnamese workers shared the same type of contract. All workers were uniformly fed and housed at the Daewoosa Samoa compound, and were required to abide by the same working and boarding conditions implemented by Daewoosa Samoa and Lee. In addition, the differences in the measure of damages are not inconsistent with the requirement that in order to maintain a class suit, each plaintiff must recover damages at the same rate. *See Kainz v. Anheuser-Busch, Inc.*, 194 F.2d 737, 741 (7th Cir. 1952).

Initially, while reserving our right to redefine the class, we described the class as all non-Samoan garment workers who presently work and formerly worked at Daewoosa Samoa. The class excluded, and still excludes, all Daewoosa Samoa managers. We now further classify the class into sub-classes, a sub-class of all Chinese workers, and a sub-class of all Vietnamese workers.

The sub-class of Vietnamese workers is further diversified, in that some were recruited by IMS, others were recruited by TC12, and six were independently recruited by Daewoosa Samoa and Lee. Therefore, for purposes of delineating the responsibility that Daewoosa Samoa, Lee, IMS and TC12 had with respect to the Vietnamese workers that each recruited, we classify the Vietnamese workers' sub-class into three groups, a sub-class of Vietnamese workers recruited by IMS, a sub-class of Vietnamese workers recruited by TC12, and a sub-class of independently recruited Vietnamese workers. Finally, for purposes of determining class-wide damages for those IMS recruited Vietnamese workers and those TC12 recruited Vietnamese workers for whom Daewoosa Samoa did not provide individualized payroll information, we further classify the IMS recruited Vietnamese workers' sub-class, and the TC12 recruited Vietnamese workers' sub-class into groups, corresponding with the date that each group arrived in American Samoa.

IMS group 1 consists of all those Vietnamese workers recruited by IMS that arrived in American Samoa on February 8, 1999. IMS group 2 consists of all those Vietnamese workers recruited by IMS that arrived in American Samoa on March 8, 1999. IMS group 3 consists of all those Vietnamese workers recruited by IMS that arrived in American Samoa on May 14, 1999. IMS group 4 consists of all those Vietnamese workers

recruited by IMS that arrived in American Samoa on June 12, 1999. TC12 group 1 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on July 15, 1999. TC12 group 2 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on July 19, 1999. TC12 group 3 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on July 22, 1999. TC12 group 4 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on July 26, 1999. TC12 group 5 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on August 3, 1999. TC12 group 6 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on August 10, 1999. TC12 group 7 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on August 24, 1999. TC12 group 8 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on October 1, 1999. TC12 group 9 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on January 1, 2000. TC12 group 10 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on May 18, 2000. Finally, TC12 group 11 consists of all those Vietnamese workers recruited by TC12 that arrived in American Samoa on May 25, 2000.

In compliance with our April 11, 2000 order, notice of these proceedings was posted at conspicuous locales at the Daewoosa Samoa compound, and the same was mailed to as many off-island workers and former Daewoosa Samoa employees as possible. The notice adequately explained the nature of these proceedings and the requirement that uninterested members of the class must affirmatively opt-out by filing a written exclusion form with the court. Counsel for the Vietnamese workers provided a proper form. To date, the court has received no exclusion request.

B. Jurisdiction over IMS

IMS is a named party defendant to this lawsuit. However, IMS did not answer the amended complaint or otherwise appear at any stage of these proceedings. On December 15, 2000, service of process of the amended complaint, and accompanied summons was made upon Chuyen, the supervising manager of the Vietnamese workers in American Samoa, including those engaged by IMS. The question, therefore, is whether service upon Chuyen sufficiently notified IMS of this pending lawsuit.

■ Consistent with our constitutional notions of due process, service of process is a notice-giving device. The primary function of the service of process rules is to bring notice of the commencement of an action to a defendant's attention and to provide a ritual that marks the court's

162

assertion of jurisdiction over the lawsuit. 4 CHARLES ALAN WRIGHT & ARTHUR P. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1063 (2d ed. 1987) (discussing the function of Fed. R. Civ. P. Rule 4, which is paralleled by T.C.R.C.P. 4) [hereinafter WRIGHT & MILLER].

■ Although IMS is a government related entity, it is unclear whether IMS is also a corporate entity or unincorporated association, making service appropriate under T.C.R.C.P. 4(d)(3). In 1976, Congress enacted the Jurisdictional Immunities of Foreign States Act ("JIFSA"), 28 U.S.C.A. §§ 1602-1611,[10] which contains provisions for the service of process upon foreign governmental instrumentalities and agencies. The JIFSA was enacted to provide access to courts of the United States, its states and territories, for resolution of ordinary legal disputes involving a foreign sovereign, their subdivisions, agents, and instrumentalities. JIFSA § 1602. The JIFSA defines the term "United States" to "[include] all territory and waters, continental or insular, subject to the jurisdiction of the United States." JIFSA § 1603 (c). Clearly, for the limited purpose of applying the JIFSA in cases before it, this court is a court of the United States, as that term is broadly defined in JIFSA § 1603 (c).

Whichever provision is applicable, both T.C.R.C.P. 4(d)(3) and the JIFSA notice provisions contain similar language allowing service upon an authorized agent of a foreign entity.

T.C.R.C.P. 4(d)(3) provides in pertinent part:

> Service shall be made . . . [u]pon a domestic or foreign corporation . . . or other unincorporated association which is subject to suit under a common name, by delivering a copy of the summons and of the complaint to a managing or general agent, or other agent authorized by appointment or by the law to receive service of process.

■ Similarly, service in accordance with the JIFSA is made upon a foreign state's agency or instrumentality "if no special arrangement exists, by delivery of a copy of the summons and complaint . . . to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States." JIFSA § 1608 (b)(2).

■ Chuyen was the authorized representative for both IMS and TC12 in American Samoa. He regularly reported to and communicated with IMS

---

[10] All citations in this opinion and order to the JIFSA generally and to specific JIFSA sections include reference to 28 U.S.C.A.

and TC12 regarding Daewoosa Samoa's employment of the Vietnamese workers. Moreover, he was specifically entrusted to deal with legal matters that pertained to the Vietnamese workers' employment, including disputes such as is the subject matter of this lawsuit. Insofar as Chuyen was a general agent for IMS and TC12, and more specifically authorized to deal with legal matters concerning the subject matter of this litigation, he was an "agent" authorized to receive process on behalf of IMS within the meaning of T.C.R.C.P. 4(d)(3) or JIFSA § 1608(b)(2).

## C. Subject Matter Jurisdiction over TC12 and IMS

The parties did not raise the question of our jurisdiction to adjudicate and render judgment upon the foreign government-related entities IMS and TC12. However, since a decision rendered without appropriate jurisdiction would not be binding on the parties, and would literally be a waste of judicial time, we address the question of our subject matter jurisdiction over the foreign parties *sua sponte*.

■ Under the JIFSA, a court has subject matter jurisdiction to adjudicate suits against foreign government-related agencies so long as the activity concerned is not covered by the JIFSA's immunity provisions. *See* JIFSA § 1605. In short, the immunity provisions codify the policy that immunity should be limited to a government's public or sovereign acts and specific internal agreements, and should not cover private or commercial activities. WRIGHT & MILLER, *supra*, at § 1111.

■ The particular JIFSA provision applicable to this case provides that a foreign sovereign is not immune from a court's jurisdiction in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." JIFSA § 1605(a)(2). This exception requires a two-fold analysis: 1) the alleged conduct must be a commercial activity, in which a private actor could take part; and 2) there must be a nexus between the plaintiffs' action and the commercial activity. *See Velidor v. L/P/G Benghazi*, 653 F.2d 812, 820 (3d Cir. 1981) (requiring a nexus between the plaintiff's grievance and the sovereign's commercial activity).

■ The claims against IMS and TC12 originate from their role in recruiting, exporting, and employing the Vietnamese workers in a for-profit garment manufacturing company in American Samoa, clearly commercial activity in which a private actor could equally participate. Furthermore, the alleged commercial activity of IMS and TC12 is the premise of the Vietnamese workers' lawsuit. The conduct of IMS and TC12, if proven, is therefore not excepted by sovereign immunity within the meaning of JIFSA § 1605(a)(2), and both IMS and TC12 would be subject to our jurisdiction.

## D. Jurisdiction over FLSA Claims

Daewoosa Samoa, Lee, and TC12 dispute our jurisdiction to adjudicate the action of the Chinese workers and Vietnamese workers under FLSA § 216(b), claiming that the individual workers' complaint is precluded by the Secretary of Labor's complaint under the FLSA in this court, CA No. 2-00.

Employees are provided by FLSA § 216(b) with a civil right of action against any employer who violates FLSA §§ 206(a), 207(a), and 215(a)(3). Additionally, the Secretary of Labor is authorized to sue on behalf of aggrieved employees for injunctive or equitable relief. *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1464 (C.D. Cal. 1996) (citations omitted). Under this scheme, once the Secretary of Labor files a complaint, FLSA § 216(b) provides that the Secretary's suit shall take precedence over an employee's suit. *Id.; see also Equal Opportunity Employment Comm'n v. AT&T*, 365 F. Supp. 1105, 1120 (E.D.Pa. 1973) (finding Secretary has exclusive right to bring FLSA § 217 action for equitable relief); *Wirtz v. W.G. Lockhart Const. Co.*, 230 F. Supp. 823 (N.D. Ohio 1964) (filing of Secretary's suit preempts rights of employees to FLSA relief); *Wirtz v. Robert E. Bob Adair, Inc.*, 224 F. Supp. 750, 756 (W.D. Ark. 1963) (filing of the Secretary's suit terminates the FLSA § 216(b) rights of employee); *Jones v. Am. Window Cleaning Corp.*, 210 F. Supp. 921, 922 (E.D. Va. 1962) (dismissing employee's suit as precluded by Secretary's complaint).

The plain language of FLSA § 216(b) clearly limits the preclusive effect of suits filed by the Secretary of Labor to suits he files under the FLSA § 217, a provision that grants federal district courts jurisdiction to restrain FLSA violations. FLSA § 216(b) reads in pertinent part: "The right to bring an action by or on behalf of any employee . . . shall terminate upon the filing of a complaint by the Secretary of Labor in an action *under section 217 of [the FLSA]. . ."* *Id.* (emphasis added).

In enacting this part of § 216 (b), Congress may have intended to prevent employees' double recovery or protect courts and employers from multiple suits concerning the same subject matter. *See Floyd v. Excel Corp.*, 51 F.Supp. 931, 933-934 (C.D. Ill. 1999).[11] However, for whatever reason, Congress clearly intended, as evidenced by the plain language of the statute to limit the preclusive effect of an FLSA suit filed

---

[11] The *Floyd* court distinguished § 216(b) on other grounds, but generally discussed congressional history regarding § 216(b) including a cite to Sen. Rep. No. 145, 87th Cong. 1st Sess., reprinted in 1961 U.S.C.A.N. 1620, 1659.

by the Secretary to those he files under § 217 or files in a federal district court. If the desired effect of § 216(b) was to preclude all FLSA suits filed by the Secretary, Congress would have surely included such language rather than the limiting language it did employ in the current version of § 216(b).[12] Therefore, since the Secretary's FLSA complaint in CA 2-00 was not filed under § 217, nor within a federal district court, it is within our jurisdiction to adjudicate the action of the Chinese workers and Vietnamese workers under FLSA § 216(b).

E. IMS and TC12 as Employers under the FLSA

TC12 further argues that it is not subject to the provisions of the FLSA because it is not an employer as defined by FLSA § 203(d). FLSA § 203(d) defines the term "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . but does not include any labor organization (other than when [acting] . . . as an employer) or anyone acting in the capacity of officer or agent of such labor organization."

■ Consistent with congressional direction, the Supreme Court has instructed courts to interpret the term "employ" in the FLSA expansively. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *see also Hale v. Arizona*, 993 F.2d 1387, 1393 (9th Cir. 1993). The definition has "'striking breadth [and] stretches the meaning of 'employer' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut.*, 503 U.S. at 326.

■ Several factors have been judicially identified to guide the analysis, such as "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonette v. Calif. Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983); *see also Bureerong*, 922 F.2d at 1467; *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (discussing whether the workers' service is an integral part of the alleged employer's business). *But see Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) (declining to apply *Bonette* factors in determination of prisoners' employment status). While these factors provide guidance for the "employer" determination, they are neither exclusive nor conclusive. *Bonette*, 704 F.2d at 1470.

---

[12] Interestingly, after obtaining a preliminary injunction against Daewoosa Samoa and Lee in CA No. 2-00 on January 10, 2000, the Secretary of Labor failed to pursue the permanent injunctive relief requested by his action. The case has since languished as an open file on our docket.

■ We apply this common-law framework of practical employment circumstances to determine the role IMS and TC12 had in the employment of the Vietnamese workers. Most significantly, IMS and TC12 had the power to hire, and wielded an overwhelming power to fire the Vietnamese workers. IMS and TC12 were instrumental in screening, and ultimately selecting the workers. They also had the power to fire the workers, which authority was leveraged with the threat of imposing hefty penalties against fired workers or their Vietnam-based family. The workers and their Vietnam-based families were, in fact, threatened with penalties when IMS and TC12 learned of the Vietnamese workers' expressed discontentment with their Daewoosa Samoa employment.

IMS and TC12 utilized Chuyen, and other supervisors, to further control the Vietnamese workers' everyday work-place situation. Chuyen, who acted as a sort of watchdog over the workers, ensured that the workers continued working regardless of the distressful conditions they faced.

Furthermore, although IMS and TC12 did not pay the workers directly, they were instrumental in determining the Vietnamese workers' rate of pay, method of payment, and hours of work.

Finally, it appears that IMS and TC12 maintained employment records, specifically the contracts entered into between the parties. When all of these employment factors are considered in light of the entire employment situation at issue in this case, IMS and TC12 functioned as employers within the meaning FLSA § 203(d).

F. FLSA Opt-In Requirement

■ Although the Chinese workers and Vietnamese workers are not precluded by the Secretary of Labor's filing of CA No. 2-00 from bringing this action under FLSA § 216(b), FLSA § 216(b) explicitly requires that each member of the class of eligible workers affirmatively consent to be a party to the FLSA action. T.C.R.C.P. 23(b)(3) requires class members to affirmatively "opt-out" of a class action suit. In contrast, FLSA § 216(b) requires employees similarly situated with the named plaintiffs to provide the court with affirmative notice of their intentions to be part of the lawsuit. *See D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 892 (D. Md. 1995).

■ A similarly situated employee may "opt in" by filing a written consent with the court where the suit is pending. *Id.* FLSA § 216(b) does not prescribe a particular format for an employee's consent to suit, and requires only that the consent must be in writing and filed in the court in which the action is brought. *See Kuhn v. Phila. Elec., Co.*, 475

167

F. Supp. 324 (E.D. Pa. 1979) (notarization not required); *Burgett v. Cudahy Co.*, 361 F. Supp. 617, 622 (D.C. Kan. 1973) (requiring only written consent). For the consent to be "in writing" the employee need only sign the document. *See Kulik v. Superior Pipe Specialities Co.*, 203 F. Supp. 938, 941 (N.D. Ill. 1962).

On January 17, 2001, approximately 168 purported members of the Vietnamese workers' class filed a signed document demonstrating their consent to bring their FLSA claims. The writing demonstrates the affirmative "opt-in" of those 168 workers. Furthermore, the Chinese workers and Vietnamese workers specifically named as plaintiffs to the suit clearly demonstrate their consent to the FLSA litigation. However, because the FLSA requires an affirmative showing of consent to suit, the failure of other class members to file written consents or be named as plaintiffs in this suit necessarily precludes them from FLSA redress.

## II. Liability for FLSA Claims

In enacting the FLSA, Congress intended to create a uniform compensation system for all work or employment engaged in by employees covered by the Act.[13]

The FLSA provides minimum substantive rights to employees subject to its mandates, which rights may not be waived by agreement. *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 740 (1981). In *Barrentine,* the Supreme Court reiterated the requisite recognition that the FLSA provides non-waivable baseline employment standards:

> This Court's decisions interpreting the FLSA have frequently emphasized the non-waivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate.

450 U.S. at 740 (1981) (citations omitted).

The Chinese workers and the Vietnamese worker contend that their respective employers amongst Daewoosa Samoa, Lee, IMS and TC12 violated the non-waivable baseline employment standards set out in

---

[13] The Chinese workers and Vietnamese workers, who worked in the manufacture of clothing for export, are unquestionably covered by the FLSA, which sets out minimum wage standards for all employees "engaged in commerce." *See* 29 U.S.C.A. § 206.

FLSA §§ 206(a) and 207(a), and discriminated against them for raising these issues in violation of FLSA § 215(a)(3). We treat each alleged violation in turn.

## A. Minimum Wage Violations

■ FLSA § 206(a) prescribes that no employee employed in American Samoa may be paid less than American Samoa's established minimum wage. American Samoa's effective minimum wage for the garment manufacturing industry, pursuant to the FLSA, was $2.55 an hour between October 27, 1998 through September 19, 2000, and $2.60 an hour from September 20, 2000. *See* 29 C.F.R. § 697(o)(1).[14]

■ The Chinese workers earned $390.00 per month, and the Vietnamese workers earned $408.00 per month. In order to calculate the hourly rate paid, we multiply the monthly salary by 12 to obtain the total pay for the year. The sum is then divided by 52 to obtain the pay per week, which is then divided by 40 hours to determine the hourly rate worked each week. *See* 29 C.F.R. § 778.113(b); *McCloskey & Co. v. Dickinson*, 56 A.2d 442, 446 (D.C. App. 1947) (using this method to determine the hourly rate from monthly salary). Under this formula, the contracts in this case allow for an hourly rate clearly below the minimum required for garment factory employees. At $390.00 a month, the hourly rate is $2.25; at $408.00 a month the hourly rate is $2.35.

## B. Overtime Wage Violations

Under FLSA § 207(a)(1):

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one-half times the regular rate at which he is employed.

Similar provisions are set forth 29 C.F.R. § 778.107, stating:

> Overtime must be compensated at a rate not less than one and one-half times the regular rate at which the employee is

---

[14] 29 CFR § 697(o)(1) reads:
The minimum wages for [the garment. manufacturing] . . . industry is $2.55 an hour effective October 27, 1998, and $2.60 an hour effective September 20, 2000.

actually employed. The regular rate of pay at which the employee is employed may in no event be less than the statutory minimum.

 While employers are free to establish the regular rate of pay, under the overtime provision of FLSA § 207(a)(1), minimum hourly rates established by FLSA § 206 must be respected. *Walling v. Younerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945). Thus, in garment manufacturing, overtime must be paid at the rate of one and one-half times the employee's regular rate of pay, which is, at the very least, American Samoa's effective minimum wage for the garment manufacturing industry at the time—$ 2.55 an hour between October 27, 1998 through September 19, 2000, and $2.60 an hour from September 20, 2000. Furthermore, any agreed-upon deduction from overtime pay that effectively diminishes such pay below the statutory requirement is invalid. *See F.W. Stock & Sons, Inc. v. Thompson*, 194 F.2d 493, 497 (6th Cir. 1952) (agreeing to pay for only part of hours worked violates the FLSA and is invalid); *see also Donovan v. Brown Equip. and Serv. Tools, Inc.*, 666 F.2d 148, 152 (5th Cir. 1982); *Johnson v. Dierks Lumber & Coal Co.*, 130 F.2d 115, 118 (5th Cir. 1962); *Walling v. Lippold*, 72 F. Supp. 339, 346 (D. Neb. 1947); *Chepard v. May*, 71 F. Supp. 389, 392-93 (S.D.N.Y. 1947).

Because the regular rate of pay of the Chinese workers and Vietnamese workers was the statutorily required minimum wage, they were entitled an overtime rate of one and one-half times the effective minimum wage in accordance with FLSA § 207(a)(1). Therefore, the workers were entitled to an overtime pay rate of $3.83 per hour between October 28, 1998 through September 20, 2000, and $3.90 per hour from September 20, 2000 onwards. Since the employers deducted varying amounts from the workers' overtime wages, the evidence was inconclusive as to the actual overtime rate of pay the employers utilized to calculate overtime wages. Nonetheless, even if overtime wages were calculated at one and one-half times the effective minimum wage, the employers' deductions illegally reduced the workers' overtime wages far below the statutory limit in violation of FLSA § 207(a)(1). The workers are therefore entitled to the difference in the lawful overtime rate and the overtime compensation actually received.

C. Discrimination for Raising Wage Issues

 Under FLSA § 215(a)(3), it is unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding."

Daewoosa Samoa and Lee, with respect to the Chinese workers and Vietnamese workers, and IMS and TC12, with respect to their recruited Vietnamese workers only, clearly violated FLSA § 215(a)(3). They continuously threatened to discharge and deport workers because they were plaintiffs in this lawsuit. Several workers were, in fact, terminated from employment and sent back to their homelands because they actively participated in pursuing their rights under the FLSA.

## D. FLSA Damages

 FLSA § 216(b) explicitly affords aggrieved employees comprehensive redress, including but not limited to back-wages, attorneys' fees, costs, and liquidated damages.

 Liquidated damages of an amount equal to unpaid minimum and overtime wages are recoverable against an employer, unless there is evidence that an employer acted in good faith and attempted to comply with FLSA requirements. An employer's knowledge that an employee might be covered by the FLSA, and failure to further inquire into the status of that employee is sufficient to establish the employer's lack of good faith. *See* 29 C.F.R. § 790.15; *see also Bankston v. Illinois*, 60 F.3d 1249, 1255 (7th Cir. 1995).

Daewoosa Samoa and Lee, with respect to the Chinese workers and Vietnamese workers, and IMS and TC12, with respect to the majority of the Vietnamese workers, knew or had reason to know that the workers were being paid in violation of the law, but failed to make a good faith effort to comply with the law. Even if Daewoosa Samoa, Lee, IMS and TC12 erroneously believed that the Vietnamese workers' contractual monthly wage was in compliance with the FLSA minimum wage requirements, having allegedly premised the contractual monthly wage of $408.00 by multiplying the minimum wage of $2.55 by a four week month working 40 hours per week, there is no similar explanation for the calculation of or deductions from the workers' overtime wage. Furthermore, Daewoosa Samoa, Lee, IMS, and TC12 were at least on constructive notice that the validity of the workers' regular and overtime wages was questionable and potentially in non-compliance with wage law when the Department of Labor began investigating Daewoosa Samoa's operations as early as May 1999. At that time, Daewoosa Samoa, Lee, IMS, and TC12 actually knew of the conditions at the factory, and their failure to pay the workers' lawful wages. However, rather than inquire about or rectify the situation, they threatened the workers to continue working under the same conditions or suffer certain consequences. More specifically, Daewoosa Samoa and Lee defiantly forced workers to return Department of Labor assisted settlement monies, or suffer termination or deportation.

171

## III. Specific Liability Issues

### A. The General Context of the Workers' Claims

The Chinese workers assert that Daewoosa Samoa and Lee breached the terms of their bargained-for employment contracts by charging illegal initial fees, and failing to pay lawful standard and overtime wages. The Vietnamese workers' claims are twofold. First, the IMS-recruited Vietnamese workers, and the TC12-recruited workers claim that Daewoosa Samoa, Lee, IMS, and TC12 jointly employed them under terms of their employment contracts. Secondly, all the Vietnamese workers allege that their respective employers charged them illegal initial fees, failed to continuously pay lawful basic wages when work was interrupted, improperly charged them for room and board, and failed to pay them their legal wages.

### B. Choice of Law

As a threshold matter, since the contracts were negotiated, contracted, and performed in various jurisdictions, we must determine whether the law of Vietnam, Korea, China, or American Samoa governs the interpretation of the various contracts at issue. Absent the parties' agreement on the governing law, or an American Samoa statutory or common-law choice of law standard, we turn to common law generally to provide guidance in determining the choice of law applicable to the contracts at issue.

The RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 196 (1971) codifies U.S. common law and provides a standard to determine the governing law for interpretation of contracts for the rendition of services. It states in pertinent part:

> § 196 Contract for the Rendition of Services
>
> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.[15]

---

[15] The relevant portions of the authors' comment provides:
The rule [of this Section] applies if the major portion of the

█ As stated, the general rule is that the law of the place of performance governs the interpretation of a contract for services, and will only be trumped if another state has a more significant relationship with the transaction or parties as set forth in § 6. *Id.*

In this case, the parties explicitly agreed that performance of the three-year employment contracts was to take place entirely at the Daewoosa Samoa factory principally located in American Samoa. In fact, the Chinese workers and Vietnamese workers rendered their services under the employment contracts at issue entirely in American Samoa. Although the parties hail from China, Vietnam, and Korea, and some of the contracts were initially negotiated in these various countries, such contacts do not override the contacts that American Samoa had with the transaction and parties, as the place of contract performance. Accordingly, since services were rendered in American Samoa, and no other jurisdiction has more significant contacts with the transaction and the parties in the case, we find that American Samoa law applies to interpret the various contracts at issue in this case.

C. Lee's Individual Liability

█ Although a corporate officer or owner is normally not subject to personal liability for the acts of the corporation, this corporate shroud of protection from liability may be pierced, and the corporate officer or owner held personally liable for the conduct of the corporation if the corporation is nothing more than his alter ego.

█ A party is an alter ego of a corporation when:

---

services called for by the contract is to be rendered in a single state and it is possible to identify this state at the time the contract is made. It is necessary that the contract should state where the major portion of the services is to be rendered or that this place can be inferred either from the contract's terms or from the nature of the services involved or from other circumstances.

. . . .

The importance in the choice-of-law process of the place where the service, or a major portion of the services, are to be rendered depends somewhat upon the nature of the services involved. This place enjoys greatest significance when the work is to be more or less stationary and is to extend over a considerable period of time. This is true of a contract for employment on the ordinary labor force of a particular factory.

> [T]here is such a unity of interest and ownership that the individuality, or separateness, of said person and corporation has ceased . . . [and] the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

*Amerika Samoa Bank v. Adams*, 22 A.S.R.2d 38 (Trial Div. 1992) (quoting *Minifie v. Rowley*, 202 P. 673, 676 (Cal. 1921)). The applied effect of the alter ego doctrine treats the corporation and the dominating person as one person, so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound. *See also Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) (citing *Shamrock Oil v. Gas Co. v. Ethridge*, 159 F. Supp. 693, 697 (D. Colo. 1958)).

 Lee clearly acted as Daewoosa Samoa's alter ego. Lee was the sole real shareholder and owner of Daewoosa Samoa during the majority of the time in question. He did not adhere to corporate formalities, except for one late and hurried attempt to distribute shares for substantially limited amounts. He clearly siphoned off corporate funds for his own use, leaving the corporate bank accounts too barren to meet employee payroll and other corporate expenses. In sum, adherence to the fiction of a separate existence between Lee and Daewoosa Samoa would promote injustice under the particular circumstances of this case.

## D. IMS and TC12 as Joint Employers of the Vietnamese Workers

The IMS and TC12-recruited Vietnamese workers contend that IMS and TC12 were their joint employers with Daewoosa Samoa and Lee under the terms of the IMS-worker contracts, TC12-worker contracts, and TC12-Daewoosa contracts, and therefore, are jointly responsible with Daewoosa Samoa and Lee to pay for their contractually agreed upon wages. TC12 opposes the workers' claim, arguing that it functioned merely as a go-between or broker responsible for securing the Vietnamese workers' employment with Daewoosa Samoa and Lee, not an employer.

 To determine whether an employment relationship exists between two parties we must look beyond the terms of the contract. *See Todd v. Benal Concrete Constr. Co.*, 710 F.2d 581, 584 (9th Cir. 1983) ("[c]ontractual language alone cannot transform a contractor/ independent contractor relationship into an employer/employee relationship"); *see also Adele's Housekeeping v. Dep't of Employment Sec.*, 757 P.2d 480, 483 (Utah Ct. App. 1988) (citing *Singer Sewing*

*Mach. Co. v. Indus. Comm'n*, 134 P.2d 479 (Utah 1943)) (looking beyond the contract to determine whether an employer/employee relationship exists). Rather, the traditional common-law rule focuses the inquiry on the alleged employer's degree of control over the alleged employee. *See generally Mares v. Marsh*, 777 F.2d 1066 (5th Cir. 1985) (Title VII case); *Ill. Conf. of Teamsters and Employers Welfare Fund v. Mrowicki*, 44 F.3d 451 (7th Cir. 1994) (stating common law test as premised on alleged employer's right to control).

IMS and TC12 acted as more than mere brokers responsible for securing the employment of their respective groups of Vietnamese workers, and functioned as employers of these workers for purposes of the workers' employment at the Daewoosa Samoa garment-manufacturing factory. We reiterate that IMS and TC12 exerted significant control over their workers' employment situation, including but not limited to, the hiring and firing of the workers. Furthermore, IMS and TC12 controlled the everyday workplace activities of the workers by employing Chuyen, and other supervisors to oversee the workers' employment, supervision that was all encompassing.

E. Breach for Charging the Vietnamese Workers Room and Board;
 Discontinuing Wage Payments

Unlike the employment of the Chinese workers unquestionably detailed in a single set of contracts executed upon the workers arrival in American Samoa, the Vietnamese workers' employment is enumerated in several separate sets of contracts. According to the IMS-worker contracts executed by some Vietnamese workers and IMS, the TC12-worker contracts executed by some Vietnamese workers and TC12, the independent worker-Daewoosa USA contracts executed by other Vietnamese workers, and the TC12-Daewoosa USA contracts signed by TC12 and Daewoosa USA, the Vietnamese workers were to be provided with free suitable room and board. Additionally, the workers understood that these contracts provided that they would be paid continuous basic wages regardless of the lack of work. In contrast, the Daewoosa Samoa-worker contracts, which Lee attempted to have all the Vietnamese workers execute, excluded these terms.

Daewoosa Samoa, Lee, and TC12 do not dispute the language of the contracts, nor their interpretation by the Vietnamese workers. Instead, Daewoosa Samoa, and Lee contend that they did not assent to employment terms providing free room and board, and continuous pay, nor authorized IMS, TC12, or Daewoosa USA to agree to such terms. Daewoosa Samoa and Lee urge that the Daewoosa Samoa-worker contracts, apparently excluding the free room and board and continuous salary provisions, evidence the bargained-for agreement between the

175

parties.

■ The well-established rule derived from the basic structure of agency law provides that a principal will be bound and liable for the acts of his agent performed with actual or apparent authority from the principal, and within the scope of the agent's employment. *See Hoffman v. John Hancock Mut. Life Ins. Co.*, 92 U.S. 161, 164 (1875) (an agent's act performed within the sphere of the authority conferred is as binding upon the principal as if it had been done by the principal himself).

Daewoosa Samoa and Lee clearly authorized IMS, TC12, and Daewoosa USA to recruit labor for its garment manufacturing factory operations. Therefore, the contracts entered into by these entities for that purpose are binding upon Daewoosa Samoa as if Daewoosa Samoa entered into them on its own account. Even if the contracts were unauthorized, Daewoosa Samoa and Lee ratified the contracts by subsequently accepting the Vietnamese workers for employment, thus manifesting their assent to the agreements. *See generally* RESTATEMENT (SECOND) OF AGENCY § 83 (1958).

Any argument that the Daewoosa Samoa-worker contracts validly amended the IMS-worker, TC12-worker, independent worker Daewoosa USA, and TC12-Daewoosa USA contracts is also flawed, where there was no consideration for any such amendment. In fact, the Daewoosa Samoa-worker contracts appear glaringly unconscionable where Daewoosa Samoa induced non-English speaking workers to sign amended English written contracts, without the benefit of a translation, and offered the workers no consideration for excluding the previously promised benefits. *See Dev. Bank of Am. Samoa v. Ilalio*, 5 A.S.R.2d 110, 122 (Trial Div. 1987) (voiding contract as unconscionable for offering grossly inadequate consideration).

We therefore hold that, rather than the Daewoosa-worker contracts, the IMS-worker contracts, TC12-worker contracts, independent worker-Daewoosa USA, and TC12-Daewoosa USA contracts reflect the bargained-for agreement between the Vietnamese workers and their respective employers. As evidenced from the plain language of the contracts, and the testimony of the workers, the agreements provide that these Vietnamese workers should receive free room and board, and continuous wages regardless of the lack of work. Daewoosa Samoa, Lee, IMS, and TC12 breached both of these terms by charging the Vietnamese workers various fees for room and board, and failing to pay them when work was interrupted.

## F. Breach of Contract for Back Wages

The Chinese and Vietnamese workers allege, as an additional basis to the FLSA for the payment of unpaid wages, that Daewoosa Samoa, Lee, with respect to the Chinese and Vietnamese workers, and they together with IMS, and TC12, with respect to the IMS and TC12-recruited Vietnamese workers, breached the terms of their respective contracts regarding their salary and overtime payments.

█ The contract terms covering the wage and overtime payments to the Chinese workers and Vietnamese workers illegally fall below the floor established by FLSA §§ 206 and 207(a)(1). However, rather than entirely invalidate the contracts at issue in this case for containing terms contrary to the FLSA, we are empowered to modify the illegal contract terms to make them conform to the law. *See Am. Samoa Gov't v. Samoa Aviation, Inc. (Hem)*, 13 A.S.R.2d 65, 67 (Trial Div. 1989); *see also Ilalio*, 5 A.S.R.2d at 110 (stating that court has option to refuse to enforce the contract, enforce the remainder of the contract without the unconscionable provisions, or so limit the application of the unconscionable provisions as to avoid any unconscionable result); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981). Therefore, to validate these contracts, we replace the minimum and overtime wage provisions of the contracts for the Chinese workers and Vietnamese workers with the baseline wage and overtime requirements of FLSA §§ 206 and 207(a)(1). *See generally Nw. Yeast Co. v. Broutin*, 133 F.2d 628 (6th Cir. 1943); *Fletcher v. Grinnell Bros.*, 64 F. Supp. 778 (E.D. Mich. 1946); *Adair v. Ferst*, 45 F. Supp. 824 (N.D. Ga. 1942) (stating that employee covered by FLSA is a creditor of his employer for any unpaid portion of the minimum wage regardless of any agreement between the parties).

As stated in the FLSA discussion, pursuant to FLSA § 206, the employers were required to pay the Chinese workers and Vietnamese workers engaged in garment manufacturing in American Samoa an hourly minimum wage of $2.55 from October 27, 1998 through September 19, 2000, and $2.60 per hour from September 20, 2000. Also, FLSA § 207(a)(1) required that each garment worker be paid overtime wages at a rate of $3.83 per hour from October 27, 1998 through September 19, 2000, and $3.90 per hour from September 20, 2000. However, contrary to these FLSA provisions, and in conspicuous breach of the employment agreements, the Chinese workers and Vietnamese workers received hourly wages of only $2.25, and $2.35, respectively. Additionally, the contracts of the Chinese workers and Vietnamese workers allowed for deductions from overtime wages, bringing these wages below that prescribed by FLSA § 207(a)(1). Accordingly, in order to compensate the Chinese workers and

Vietnamese workers for the breach of their contracts, the employers must reimburse them for the difference in the hourly and overtime wages earned and those actually paid.

## G. Breach of Contract for Charging Illegal Initial Fees

The Chinese workers and Vietnamese workers further contend that the employers breached their employment contracts by charging the workers illegal initial fees. As a condition of each worker's employment at the Daewoosa Samoa factory, each worker was required to pay exorbitant initial fees, ranging from $3,000.00 to $7,683.00, allegedly to pay a security deposit, the workers' airfare, and various government fees or taxes.

 We reiterate that we are empowered to modify an illegal contract term without invalidating the entire contract. *See Samoa Aviation, Inc.*, 13 A.S.R.2d at 67. The contract requirement that the Chinese workers and Vietnamese workers pay sums of money up front was clearly an illegal ploy to defraud the workers and their families of their money, and obligate the workers to the term of their employment contracts or suffer loss of the fees, and deposit. Though already essentially destitute, the workers and their families were further impoverished in their attempts to secure the requisite funds, doing it nevertheless for the promise of employment in American Samoa. However, the employers never provided the Chinese workers and Vietnamese workers their promised-for employment. Instead, the workers lived in substandard conditions, went underpaid for months, and on one occasion at least some workers were unfed for at least two days. Accordingly, the contract clause requiring that the workers pay varying initial fees is invalid and must be struck from the contracts, and the employers are responsible to reimburse their respective workers these monies.

## IV. Computation of Back Wages

 The availability of individualized payroll evidence for all of the Chinese workers, and the majority of the Vietnamese workers make individual back pay and liquidated damages awards possible as to these workers. However, because individual awards for those Vietnamese workers for whom payroll summaries were not provided are unascertainable, class-wide awards are provided for such workers. An individualized remedy should be utilized when possible because it will compensate the claimants without unfairly penalizing the employer. *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976) (citing *United States v. United States Steel Corp.*, 520 F.2d 1043, 1055 (5th Cir. 1975)) (awarding individualized and class-wide Title VII back pay awards).

## A. Chinese Workers' Individual Back Wages

Rather than utilizing the monthly wage rate of $390.00 per month, the Chinese workers' accountant determined the amount of regular and overtime wages owed, less deductions for FICA contributions, ASG income taxes, and less any payments already received.[16] We accept the accountant's calculation of the Chinese workers' back-wages. Although Daewoosa Samoa submitted payroll summaries regarding the Chinese workers back wages, we find the calculations of the Chinese workers' accountant more credible. The Chinese workers' accountant premised his report upon the diaries and records of the individual workers, and Daewoosa Samoa admitted to owing equivalent amounts at least prior to June 24, 1999.[17]

## B. Vietnamese Workers' Individual Back Wages

At trial, Daewoosa Samoa and Lee submitted payroll summaries regarding the amounts owed the Vietnamese workers. These figures contrasted significantly with the Vietnamese workers' analysis in closing arguments. We are reluctant to wholeheartedly accept either side's summaries of the back wages owed the Vietnamese workers for several reasons.

The Vietnamese workers' summary was not presented as evidence at trial, thereby depriving Daewoosa Samoa, Lee, and TC12 the benefit of cross-examination. For example, as TC12 accurately points out, some of the Vietnamese workers' mathematical calculations as to the number of months within a given range of months are in error, a point that would have been best brought to light and fully examined during the trial.

On the other hand, while the employers' records appear to be the best evidence available regarding certain amounts, Daewoosa's records are otherwise inaccurate with regards to the regular hours worked by the Vietnamese workers. They deducted amounts for room and board in violation of these workers' agreements. Furthermore, they failed to calculate the time that the Vietnamese workers lay idle.

As discussed earlier, the Vietnamese workers' are contractually entitled

---

[16] Deductions were not taken out for the Chinese workers' room and board given our finding that the Daewoosa Samoa provided room and board was substandard. *See* Part VI.B, "Substandard Room and Board," *infra.*

[17] In a June 24, 1999 letter to the Chinese workers' counsel, Daewoosa Samoa agreed to owing an amount of wages equivalent to the accountant's calculated amount.

to be compensated for their idle time if there is no work for no fault of their own. The weight of the evidence indicates that the Vietnamese workers would have worked the entire time that they were in American Samoa but for the unavailability of work caused by the employers. The times that the Vietnamese workers lay idle were caused by either factory shutdowns or the employers' failure to pay them. The Vietnamese workers are therefore entitled to be compensated their regular wage for this idle time.

Accordingly, we calculated the total amount of basic wages the Vietnamese workers earned based upon the total amount of regular working days that each such worker spent in American Samoa.[18] We multiplied this time by the relevant legal minimum rate to arrive at the gross amount of regular wages earned.

Given the substantial inconsistencies between the overtime records and the Vietnamese workers' testimony, and the varying deductions from overtime earnings taken by their employers, owed overtime wages are more difficult to determine. Nonetheless, utilizing payroll records submitted by Daewoosa Samoa and Lee, we were able to determine the amount of overtime wages owed the Vietnamese workers. Without better contrary evidence, we find that these hours are the best evidence of the overtime hours worked. Using these provided numbers, we derived the total amount of overtime wages earned by multiplying the total amount of overtime hours presented by Daewoosa Samoa and Lee by the applicable overtime rate.

We then determined the total amount of owed back wages by deducting the applicable FICA contributions and ASG income taxes, and the

---

[18] Except for the working days of the two deceased IMS Vietnamese workers, the Vietnamese workers' regular working days were calculated from the first full workweek day after each worker arrived in American Samoa to January 12, 2001. By January 12, 2001, Daewoosa Samoa was non-operational, most of the workers had requested to return to Vietnam or to leave for elsewhere, and a court appointed receiver had assumed full responsibility of the Daewoosa Samoa operation. As for Nguyen Thi Nga, and Dung Kim Thi Vu, their regular working days necessarily ended on the approximate date of their deaths or the last date of their employment, whichever occurred sooner. Accordingly, we calculated Nguyen Thi Nga's owed back wages to the approximate date of her death, or August 31, 2000. However, because Dung Kim Thi Vu worked only 20 days, and was compensated for these days, she is not entitled to any owed back wages. Our finding does not, however, preclude Dung Kim Thi Vu from entitlement to other class-wide damages in accordance with this decision.

amount the Vietnamese workers received from the gross amount earned.

## C. Class-wide Back Pay and Liquidated Damages

■ Individual back pay awards were unidentifiable for members of the IMS-recruited and TC12-recruited Vietnamese workers' classes for whom Daewoosa Samoa and Lee failed to submit payroll summaries. Therefore, we must utilize a class-wide method to ascertain these workers' damages. Although a class-wide method of computing back wages is basically an estimation that oftentimes results in unequal awards, creating a windfall for some, and under-compensating others, "[a]ny method is simply a process of conjectures." *Stewart*, 542 F.2d at 453 (citing *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 261 (5th Cir. 1974)). An estimate of the measure of damages is better than no damages at all. *Id.*

The amount of total regular wages for each unidentified IMS-recruited Vietnamese worker and each unidentified TC12-recruited Vietnamese worker is ascertainable based on the amount of time that they spent in American Samoa. Furthermore, since it appears that these workers worked and were compensated at approximately the same rate as those identified Vietnamese workers, we derived an estimation of overtime wages and payments received for each unidentified Vietnamese worker by calculating the average overtime earned and payments received of the named and identifiable members of each corresponding IMS-recruited Vietnamese worker's group or TC12-recruited Vietnamese worker's group. Using the same formula utilized to derive the named and identifiable workers' individualized awards, we determined each unidentified workers' back pay by deducting FICA contributions, ASG taxes, and payments received from the total regular and overtime wages earned.

## VI. Other Related Claims

### A. NRLB Exclusive Jurisdiction Issue

Before dealing with the merits of the Vietnamese workers' other related claims, we first discuss TC12's contention that the overall theme of these claims falls outside our jurisdiction because they are directly within the exclusive jurisdiction of the Labor Relations Management Board ("NLRB"). *See Labor Mgm't Relations Act*, 1947, 29 LT.S.C.A. § 141 *et seq*. TC12 cites the case of *Suki v. Star Kist Samoa, Inc.*, 4 A.S.R.2d 135 (Trial Div. 1987), as authority for its proposition that the workers' discrimination and related claims are within the NLRB's exclusive jurisdiction.

In *Suki,* the court held that the NLRB exercised exclusive jurisdiction over unfair labor practice complaints filed in the High Court of American Samoa if they were within the NLRB's jurisdiction, and the NLRB had not declined jurisdiction. *See generally id.* The court dismissed for lack of jurisdiction the employee's claim of work-place discrimination for attempting to organize a labor union finding that "[e]mployment discrimination on account of union activity is perhaps the single most obvious example of conduct committed to the regulatory authority of the NLRB." *Id.* at 137. However, unlike the claim presented in *Suki,* the resolution of employees' assorted claims are not related to any foiled attempt to organize a labor union, and are not otherwise specifically reserved to the NLRB's jurisdiction. Therefore, these claims remain within our jurisdiction.

B. Substandard Room and Board

The Chinese workers and Vietnamese workers contend that Daewoosa Samoa and Lee failed to provide them with adequate housing and food as promised in their employment contracts. Daewoosa Samoa and Lee admit that they owe the workers a duty to provide them with suitable housing and nutritional meals. However, they contend that the provided lodging and food satisfied their contractual obligations.

It is clear that the housing and meals at the Daewoosa facility fell short of Daewoosa Samoa and Lee's representations, and the workers' expectations. The rooms were overcrowded, and the bathroom facilities inadequate and ill-equipped. In addition, the workers' meals did not meet the asserted standard for nutritional food set forth by the United States Department of Agriculture ("USDA") nutritional guidelines. The USDA Food and Nutrition Center recommends a daily intake of and variety from the five basic food groups: 1) carbohydrates; 2) vegetables; 3) fruits; 4) dairy products; and 5) protein.[19]

Dr. Margaret credibly explained that Daewoosa Samoa and Lee did not comply with these basic guidelines by failing to provide fresh vegetables and fruits in the workers' daily meals. Although Dr. Margaret was unable to determine whether the meals satisfied other USDA nutritional requirements, evidence elicited from the workers suggested that the meals were overall below USDA standards.

 In addition to our finding that the Vietnamese workers are contractually entitled to free room and board, we further find that due to

---

[19] The Food and Nutrition Center is an information branch of the National Agricultural Library, which is part of the U.S. Department of Agriculture, Agricultural Research Service.

the substandard quality of the Daewoosa provided meals and accommodations, none of the boarding workers, including the Chinese workers, should be required to pay for such accommodations. In addition, the Chinese workers, and Vietnamese workers are entitled to compensation for being subjected to such poor living conditions in the amount of $1,500 each.

C. Withholding of Passports and Identification Cards

The Chinese workers and Vietnamese workers also assert that Daewoosa Samoa and Lee illegally withheld their passports and certificate of alien registration receipt cards. Daewoosa Samoa and Lee argue that they held on to the workers' passports and other identification documents for immigration processing purposes.

■ A passport, or any other document purporting to show one's identity, is perhaps one's most personal possession, especially sacred to one traveling to a foreign country. In addition, American Samoa law requires that every alien carry their registration card on their person at all times. According to A.S.C.A. § 41.0310(a), "[e]very alien . . . shall *at all times* carry with him and have in his personal possession any certificate of alien registration receipt card issued him." *Id.* (emphasis added). Failure to comply with A.S.C.A. § 41.0310 subjects the registered alien to criminal penalty, a $500 fine, or, for most aliens the worst consequence, deportation. *See* A.S.C.A. § 41.0310(b)-(c).

■ Rather than taking the workers' identification documents to further any immigration purpose, it is apparent that Daewoosa Samoa and Lee illegally maintained workers' passports, and registration cards, without any legal right, and as a means of limiting the workers' egress and ingress from the compound. For this transgression, the Chinese workers and Vietnamese workers are entitled to compensation in the amount of $1,000 each.

D. Returning Workers to China and Vietnam

The workers allege that Daewoosa Samoa and Lee violated their due process rights under the Revised Constitution of American Samoa Article I § 2, by having them deported without an opportunity to consult an attorney or have a deportation hearing. The workers provide no legal premise for holding a private employer subject to the Article I § 2 due process requirement, and without such an explanation their due process claim necessarily fails.

The workers also claim that Daewoosa Samoa and Lee violated an alleged statutory right under A.S.C.A. § 41.0408(i) to remain in

American Samoa for up to 10 days after the revocation of their sponsorship.

When read in its entirety, A.S.C.A. § 41.0408(i) governs the conduct of the immigration board, which is empowered with the authority to deport, not the alien's sponsor or employer. While a sponsor or employer may be instrumental in initiating the process of deportation by revoking sponsorship or terminating employment, it is ultimately the immigration board that makes the finding of deportation. Furthermore, the immigration laws allow an alien worker's sponsor almost unlimited discretion to revoke sponsorship, the only requirement being that the sponsor provide written notice to the immigration board and the person sponsored of his or her intent to end the alien's sponsorship. *See* A.S.C.A. § 41.0408(g).[20] We, therefore, cannot find that Daewoosa Samoa and Lee, or any other employer defendant, violated any right allegedly granted aliens under A.S.C.A § 41.0408(i).

## VII. Indemnification

TC12 asserts that Daewoosa Samoa and Lee are liable to reimburse TC12 approximately $450,000.00, the portion of the initial fees collected by TC12 from the recruited Vietnamese workers and transferred by TC12 to Daewoosa Samoa and Lee. Basically, TC12 requests that Daewoosa Samoa and Lee indemnify it an amount of the initial fees for which we have found them jointly and severally liable.

Admittedly, a large portion of the money TC12 gave Daewoosa Samoa and Lee was earmarked to pay for the Vietnamese workers' individual immigration bonds, for which Daewoosa Samoa and Lee posted only a lump-sum immigration bond in the amount of $10,000. However, as discussed in a previous section, the contract requirement that the Vietnamese workers pay initial fees, and, for purposes of this discussion, that the TC12-recruited Vietnamese workers pay initial fees, in the first instance, was unlawful as an unconscionable contract clause. "Generally, a contract to indemnify against the consequences of a wrongful act, or a contract of indemnity growing immediately out of, and connected with, an illegal or immoral act is void and will not be enforced by a court of justice." 41 AM. JUR. 2D *Indemnity* § 11 (1995); *see also Kansas City Operating Corp. v. Durwood*, 278 F.2d. 354, 359 (8th Cir. 1960); 8 SAMUEL WILLISTON ET AL., A TREATISE ON THE LAW OF

---

[20] In effect, the broad discretion provided a sponsor by American Samoa's immigration laws may allow a sponsor with an opportunity to take advantage of their sponsored worker, as became evident in this case. However, immigration law reform is a matter for legislative review, not judicial interpretation.

CONTRACTS § 19:18 (4th ed. 1998). Because TC12 together with Daewoosa Samoa and Lee were joint parties to the unlawful contract clause requiring that the Vietnamese workers pay initial fees, we leave them as we find them, and accordingly, we refuse to enforce any implied right of indemnification as between TC12 and Daewoosa Samoa and Lee.

## Order

A. Individual Back Wages and Liquidated Damages

1. Chinese Workers. Daewoosa Samoa, and Lee are jointly and severally liable to remunerate the Chinese workers listed back wages and an equal amount as liquidated damages as indicated in the "Total Owed to the Chinese Workers" column in the following table. In addition, Daewoosa Samoa, and Lee shall pay the applicable federal and ASG government agencies the amounts deducted from each Chinese workers' earned income respectively for FICA withholdings and ASG taxes, except for those amounts already paid during the Spring of 2000.

| CHINESE WORKERS | Gross Total Earned | FICA Deduct. | ASG Tax Deduct. | Total Amount Paid | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| Group 1 | | | | | | | |
| Jiang Shunzhe | $13,225.41 | $1,011.74 | $264.51 | $7,937.38 | $4,011.78 | $4,011.78 | $8023.56 |
| Zheng Wude | $13,225.41 | $1,011.74 | $264.51 | $0.00 | $11,949.16 | $11,949.16 | $23,898.32 |
| Li Chengnui | $17,679.15 | $1,352.45 | $353.83 | $9,722.99 | $6,299.88 | $6,299.88 | $12,599.76 |
| Jin Chungfen | $13,225.41 | $1,011.74 | $264.51 | $0.00 | $11,949.16 | $11,949.16 | $23,898.32 |
| Li Jin Hao | $13,225.41 | $1,011.74 | $264.51 | $0.00 | $11,949.16 | $11,949.16 | $23,898.32 |
| Bai Huiguo | $13,225.41 | $1,011.74 | $264.51 | $7,764.99 | $4,184.17 | $4,184.17 | $8368.32 |
| Z. Yuandou | $17,679.15 | $1,352.45 | $353.83 | $9,724.69 | $6,248.18 | $6,248.18 | $12,496.36 |
| Ju Dongming | $13,225.41 | $1,011.74 | $264.51 | $9,229.87 | $2,719.29 | $2,719.29 | $5,438.58 |
| Li Huxie | $13,225.41 | $1,011.74 | $264.51 | $0.00 | $11,949.78 | $11,949.78 | $23,898.32 |
| PiaoYingium | $13,225.41 | $1,011.74 | $264.51 | $0.00 | $11,949.78 | $11,949.78 | $23,898.32 |
| P. Chenghuan | $13,225.41 | $1,011.74 | $264.51 | $0.00 | $11,949.78 | $11,949.78 | $23,898.32 |
| Piao Rilong | $13,225.41 | $1,011.74 | $264.51 | $0.00 | $11,949.78 | $11,949.78 | $23,898.32 |
| Z. Liangho | $13,225.41 | $1,011.74 | $264.51 | $7,878.91 | $4,070.25 | $4,070 25 | $8,140.50 |
| Group 2 | | | | | | | |
| Lu Yingzhe | $10,725.30 | $820.49 | $214.51 | $0.00 | $9,690.30 | $9,690.30 | $19,380.60 |
| Jin Mingzhen | $10,725.30 | $820.49 | $214.51 | $0.00 | $9,690.30 | $9,690.30 | $19,380.60 |
| Tan Zhen | $10,725.30 | $820.49 | $214.51 | $7,271.73 | $2,418.57 | $2,418.57 | $4,837.14 |
| K. Donghuan | $10,725.30 | $820.49 | $214.51 | $0.00 | $9,690.30 | $9,690.30 | $19,380.60 |
| Lu Zhan Zhi | $10,725.30 | $820.49 | $214.51 | $0.00 | $9,690.30 | $9,690.30 | $19,380.60 |

2. IMS Recruited Vietnamese Workers. Daewoosa Samoa, Lee, and IMS are jointly and severally liable to pay each IMS recruited Vietnamese worker back wages, and, if opted-in, an equal amount as liquidated damages as indicated in the "Total Owed to IMS Workers" column in the following table. In addition, Daewoosa Samoa, Lee, and IMS shall pay the applicable federal and ASG government agencies the amounts deducted from each IMS recruited Vietnamese workers' earned

income respectively for FICA withholdings and ASG taxes, except for those amounts already paid during the Spring of 2000.

| IMS VIETNAMESE WORKERS | Gross Total Earned | FICA Deduction | ASG Tax Deduct. | Total Payment Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| **IMS Group 1** | | | | | | | |
| Nguyen T Chat | $12,514.74 | $957.38 | $250.29 | $5,844.57 | $5,462.49 | $5,537.77 | $11,000.26 |
| Nguyen T.M. Phuong | $12,726.58 | $973.58 | $254.53 | $6,120.13 | $5,378.33 | $5,378.33 | $10,756.66 |
| Vu T. Hong | $12,491.90 | $955.63 | $249.84 | $5,179.62 | $6,106.81 | $6,106.81 | $12,213.61 |
| Nguyen T. Phuong | $12,366.63 | $946.05 | $247.33 | $5,611.02 | $5,562.23 | NO OPT-IN | $5,562.23 |
| Le Bich Thuy | $13,224.65 | $1,011.69 | $264.49 | $7,758.39 | $4,190.08 | NO OPT-IN | $4,190.08 |
| Trinh Thi Hao | $12,835.21 | $981.89 | $256.70 | $8,180.05 | $3,416.56 | $3,416.56 | $6,833.12 |
| Thinh T. Oanh | $12,579.02 | $962.29 | $251.58 | $6,183.78 | $5,181.36 | NO OPT-IN | $5,181.36 |
| Do Thi Gam | $12,386.43 | $947.56 | $247.73 | $7,705.96 | $3,485.18 | $3,485.18 | $6,970.36 |
| **IMS Group 2** | | | | | | | |
| Nguyen T. Nga* | $10,595.54 | $810.56 | $211.91 | $3,373.90 | $6,199.17 | $6,199.17 | $12,398.33 |
| Vu Thi Sim | $12,112.48 | $926.60 | $242.25 | $7,311.93 | $3,631.70 | $3,631.70 | $7,263.39 |
| Hoang T.H. Minh | $12,388.42 | $947.71 | $247.77 | $7,250.89 | $3,942.04 | $3,942.04 | $7,884.09 |
| **IMS Group 3** | | | | | | | |
| Nguyen T. M. Phu | $11,157.94 | $853.58 | $223.16 | $6,735.95 | $3,345.25 | NO OPT-IN | $3,345.25 |
| Ta T. H. Tuyet | $11,109.51 | $849.88 | $222.19 | $6,859.28 | $3,178.16 | $3,178.16 | $6,356.32 |
| Nguyen T. Loan | $10,789.39 | $825.39 | $215.79 | $6,414.98 | $3,333.23 | $3,333.23 | $6,666.46 |
| Cu T. M. Thien | $10,779.67 | $824.64 | $215.59 | $6,150.38 | $3,589.05 | NO OPT-IN | $3,589.05 |
| Pham Thi Sinh | $10,894.57 | $833.43 | $217.89 | $6,289.31 | $3,553.93 | $3,553.93 | $7,107.87 |
| Vu T. T. Hong | $11,126.39 | $851.17 | $222.53 | $6,243.46 | $3,809.23 | $3,809.23 | $7,618.47 |
| Hoang T. T. Hoa | $11,115.50 | $850.34 | $222.31 | $6,388.62 | $3,654.23 | NO OPT-IN | $3,654.23 |
| Tran Thi Lieu | $11,082.24 | $847.79 | $221.64 | $6,427.76 | $3,585.04 | NO OPT-IN | $3,585.04 |
| Tran T. T. Hang | $11,047.77 | $845.15 | $220.96 | $6,306.56 | $3,675.10 | NO OPT-IN | $3,675.10 |
| Ly Thi T. Sau | $10,971.31 | $839.31 | $219.43 | $6,279.37 | $3,633.21 | $3,633.21 | $7,266.42 |
| Cao Thi Thuy | $10,651.37 | $814.83 | $213.03 | $5,646.64 | $3,976.87 | $3,976.87 | $7,953.74 |
| Pham T. Huong | $11,034.37 | $844.13 | $220.69 | $6,124.13 | $3,845.42 | NO OPT-IN | $3,845.42 |
| Nguyen T Tuyet | $11,105.22 | $849.55 | $222.10 | $6,308.47 | $3,725.10 | $3,725.10 | $7,450.19 |
| Tran T. M. Lam | $11,051.60 | $845.45 | $221.03 | $6,172.39 | $3,812.73 | $3,812.73 | $7,625.46 |
| **IMS Group 4** | | | | | | | |
| Nguyen TB Luong | $10,691.55 | $817.90 | $213.83 | $5,945.66 | $3,714.15 | $3,714.15 | $7,428.30 |
| Hoang Thi Lien | $10,190.07 | $779.54 | $203.80 | $5,778.83 | $3,427.90 | NO OPT-IN | $3,427.90 |
| Nguyen T. Hanh | $10,107.40 | $773.22 | $202.15 | $5,535.72 | $3,596.32 | $3,596.32 | $7,192.63 |
| Nguyen T. Hong | $10,107.40 | $773.22 | $202.15 | $5,573.56 | $3,558.48 | $3,558.48 | $7,116.95 |
| Dang T.T. Huyen | $10,155.28 | $776.88 | $203.11 | $5,728.38 | $3,446.91 | $3,446.91 | $6,893.82 |
| Nguyen T.T. Hien | $10,693.39 | $818.04 | $213.87 | $5,819.51 | $3,841.97 | $3,841.97 | $7,683.94 |
| Vu Thi Ngoc Anh | $10,643.60 | $814.24 | $212.87 | $5,853.87 | $3,762.62 | $3,762.62 | $7,525.25 |
| Nguyen T.T. Mai | $10,523.03 | $805.01 | $210.46 | $5,716.34 | $3,791.21 | $3,791.21 | $7,582.43 |
| Bui Thi Cuc | $10,218.47 | $781.71 | $204.37 | $6,000.48 | $3,231.91 | NO OPT-IN | $3,231.91 |
| Pham T T. Ngan | $10,348.69 | $791.67 | $206.97 | $9,570.71 | $0.00 | NO OPT-IN | $0.00 |

*Nguyen Thi Nga's owed back wages award, and any other damages she is entitled to, as well as any class-wide damages Dung Kim Thi Vu is entitled to, shall be made payable to their respective estates, or their equivalents.

186

| IMS VIETNAMESE WORKERS | Gross Total Earned | FICA Deduct. | ASG Tax Deduct. | Total Payment Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| IMS Group 4 (cont'd) | | | | | | | |
| Nguyen T.B. Thuy | $10,768.08 | $823.76 | $215.36 | $6,641.03 | $3,087.93 | $3,087.93 | $6,175.85 |
| Dao Van Hung | $10,124.64 | $774.53 | $202.49 | $5,702.77 | $3,444.84 | $3,444.84 | $6,889.68 |
| Nguyen Thi Ha | $10,185.92 | $779.22 | $203.72 | $6,011.10 | $3,191.87 | NO OPT-IN | $3,191.87 |
| Tran Thi Thu Ha | $10,185.92 | $779.22 | $203.72 | $6,070.10 | $3,132.87 | $3,132.87 | $6,265.75 |

3. TC12 Recruited Vietnamese Workers. Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12 recruited Vietnamese worker back wages, and, if opted-in, an equal amount as liquidated damages, as indicated in the "Total Owed to TC12 Workers" column in the following table. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal and ASG government agencies the amounts deducted from each TC12 recruited Vietnamese workers' earned income respectively for FICA withholdings and ASG taxes, except for those amounts already paid during the Spring of 2000.

| TC12 VIETNAMESE WORKERS | Gross Total Earned | FICA Deduct. | ASG Tax Deduct. | Total Payments Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| TC12 Group 1 | | | | | | | |
| Nguyen Thi Thai | $9,389.92 | $718.33 | $187.80 | $5,026.59 | $3,457.20 | $3,457.20 | $6,914.40 |
| Pham Thi Ngan | $9,819.52 | $751.19 | $196.39 | $5,453.55 | $3,418.38 | $3,418.38 | $6,836.76 |
| Nguyen T. M. Hang | $9,726.96 | $744.11 | $194.54 | $5,328.06 | $3,460.24 | $3,460.24 | $6,920.49 |
| Bui Thi Hau | $12,870.48 | $984.59 | $257.41 | $8,816.03 | $2,812.45 | NO OPT-IN | $2,812.45 |
| Hoang Thi Tham | $9,427.56 | $721.21 | $188.55 | $5,306.34 | $3,211.46 | NO OPT-IN | $3,211.46 |
| Nguyen Thi Hang | $9,967.38 | $762.50 | $199.35 | $5,471.99 | $3,533.54 | $3,533.54 | $7,067.08 |
| Nguyen Thi Anh | $9,370.91 | $716.87 | $187.42 | $5,050.01 | $3,416.60 | NO OPT-IN | $3,416.60 |
| Hoang Thi Loan | $9,378.43 | $717.45 | $187.57 | $5,059.82 | $3,413.59 | $3,413.59 | $6,827.17 |
| Dang T. T. Binh | $9,640.06 | $737.46 | $192.80 | $5,818.71 | $2,891.08 | $2,891.08 | $5,782.16 |
| Nguyen T. Lan Anh | $9,462.69 | $723.90 | $189.25 | $5,348.15 | $3,201.39 | NO OPT-IN | $3,201.39 |
| Dao Thi Thanh Tam | $9,259.84 | $708.38 | $185.20 | $5,224.90 | $3,141.36 | $3,141.36 | $6,282.72 |
| Bui Thi Thoa | $9,357.36 | $715.84 | $187.15 | $5,045.69 | $3,408.68 | $3,408.68 | $6,817.37 |
| Do Thi Xuan | $9,805.47 | $750.12 | $196.11 | $5,421.12 | $3,438.12 | $3,438.12 | $6,876.24 |
| Nguyen Thi Nga | $9,407.15 | $719.65 | $188.14 | $5,054.39 | $3,444.97 | $3,546.13 | $6,991.10 |
| Do Thi Nga | $9,280.90 | $709.99 | $185.62 | $5,243.22 | $3,142.07 | $3,142.07 | $6,284.15 |
| Le Thi Voc | $9,290.34 | $710.71 | $185.81 | $5,045.59 | $3,348.23 | $3,348.23 | $6,696.46 |
| Vu Thi Duyen | $9,350.02 | $715.28 | $187.00 | $4,991.44 | $3,456.30 | $3,456.30 | $6,912.60 |
| Nguyen Thi Thuy | $9,707.81 | $742.65 | $194.16 | $5,200.91 | $3,570.09 | NO OPT-IN | $3,570.09 |
| TC12 Group 2 | | | | | | | |
| La Ngoc Hung | $9,284.01 | $710.23 | $185.68 | $4,761.74 | $3,626.36 | $3,626.36 | $7,252.72 |
| Nguyen Thi Thuan | $11,750.82 | $898.94 | $235.02 | $8,067.37 | $2,549.49 | $2,549.49 | $5,098.98 |
| Vu Thi Kim Yen | $9,381.67 | $717.70 | $187.63 | $5,190.16 | $3,286.18 | $3,286.18 | $6,572.36 |
| Hoang Trong Thuy | $9,157.90 | $700.58 | $183.16 | $4,711.21 | $3,562.95 | $3,562.95 | $7,125.90 |
| Nguyen Thai Quang | $9,314.65 | $712.57 | $186.29 | $4,804.24 | $3,611.54 | $3,611.54 | $7,223.08 |
| Nguyen Thi Men | $9,734.17 | $744.66 | $194.68 | $5,512.89 | $3,281.93 | $3,281.93 | $6,563.87 |
| PhamThi Thuy | $9,687.24 | $741.07 | $193.74 | $5,774.71 | $2,977.71 | $2,977.71 | $5,955.42 |

187

| TC12 VIETNAMESE WORKERS | Gross Total Earned | FICA Deduct. | ASG Tax Deduct. | Total Payments Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| **TC12 Group 2 (cont'd)** | | | | | | | |
| Pham Van Tien | $9,004.49 | $688.84 | $180.09 | $4,689.49 | $3,446.06 | $3,446.06 | $6,892.12 |
| Nguyen Tien Phong | $9,332.02 | $713.90 | $186.64 | $5,099.96 | $3,331.52 | $3,331.52 | $6,663.04 |
| Nguyen Van Dung | $9,475.51 | $724.88 | $189.51 | $5,010.07 | $3,551.05 | $3,551.05 | $7,102.10 |
| Bui Dinh Hung | $8,345.66 | $638.44 | $166.91 | $3,343.43 | $4,196.87 | $4,196.87 | $8,393.74 |
| Nguyen Huu The | $9,324.22 | $713.30 | $186.48 | $4,759.25 | $3,665.18 | $3,665.18 | $7,330.37 |
| An Viet Tuan | $9,345.29 | $714.91 | $186.91 | $4,883.79 | $3,559.67 | $3,559.67 | $7,119.35 |
| Dinh Quang Dai | $9,381.12 | $717.66 | $187.62 | $5,141.23 | $3,334.61 | $3,334.61 | $6,669.22 |
| Nguyen D. D. Linh | $9,477.42 | $725.02 | $189.55 | $5,144.59 | $3,418.26 | $3,418.26 | $6,836.52 |
| Ngo Thi Dung | $9,253.51 | $707.89 | $185.07 | $5,241.70 | $3,118.84 | $3,118.84 | $6,237.68 |
| | | | | | | | |
| **TC12 Group 3** | | | | | | | |
| Hoang Thi Hang | $9,464.42 | $724.03 | $189.29 | $4,977.01 | $3,574.09 | $3,574.09 | $7,148.19 |
| Tran Khanh Minh | $9,441.44 | $722.27 | $188.83 | $4,935.33 | $3,595.01 | NO OPT-IN | $3,595.01 |
| Nguyen T. B. Tuyet | $9,517.72 | $728.11 | $190.35 | $4,837.86 | $3,761.40 | $3,761.40 | $7,522.79 |
| Nguyen T. L. Minh | $10,306.70 | $788.46 | $206.13 | $5,392.08 | $3,920.02 | $3,920.02 | $7,840.04 |
| Bui T. T. Huyen | $9,762.84 | $746.86 | $195.26 | $5,086.83 | $3,733.89 | $3,733.89 | $7,467.78 |
| Nguyen Hai Que | $9,770.50 | $747.44 | $195.41 | $5,138.23 | $3,689.41 | $3,689.41 | $7,378.82 |
| Nguyen Thi Tuyet | $9,504.31 | $727.08 | $190.09 | $5,275.89 | $3,311.25 | $3,311.25 | $6,622.51 |
| Nguyen Thi Cuc | $9,366.43 | $716.53 | $187.33 | $5,161.49 | $3,301.08 | $3,301.08 | $6,602.16 |
| Tran Thi Hoa | $9,429.63 | $721.37 | $188.59 | $5,129.78 | $3,389.89 | NO OPT-IN | $3,389.89 |
| Nguyen Le Huong | $9,259.51 | $708.35 | $185.19 | $4,838.76 | $3,527.20 | $3,527.20 | $7,054.41 |
| Pham Thi Phuong | $9,343.45 | $714.77 | $186.87 | $4,863.67 | $3,578.14 | $3,578.14 | $7,156.27 |
| Tran Thanh Yen | $9,184.65 | $702.63 | $183.69 | $4,882.39 | $3,415.94 | NO OPT-IN | $3,415.94 |
| Do Thi Sau | $9,381.75 | $717.70 | $187.64 | $4,937.43 | $3,538.98 | $3,538.98 | $7,077.96 |
| Nguyen Thi H. Sen | $9,010.24 | $689.28 | $180.20 | $4,605.08 | $3,535.67 | $3,535.67 | $7,071.34 |
| Khong Thi Van Nga | $9,280.26 | $709.94 | $185.61 | $4,797.71 | $3,587.00 | 3,587.00 | $7,174.00 |
| Do Thi Chau Giang | $8,991.09 | $687.82 | $179.82 | $4,540.25 | $3,583.20 | $3,583.20 | $7,166.40 |
| Nguyen Van Thanh | $9,213.23 | $704.81 | $184.26 | $4,681.02 | $3,643.13 | $3,643.13 | $7,286.27 |
| Le Thi Huong | $9,642.30 | $737.64 | $192.85 | $5,231.99 | $3,479.82 | $3,479.82 | $6,959.65 |
| Le Thi Thanh | $9,138.55 | $699.10 | $182.77 | $4,892.09 | $3,364.59 | $3,364.59 | $6,729.17 |
| | | | | | | | |
| **TC12 Group 4** | | | | | | | |
| Nguyen Thi P. Lan | $11,237.44 | $859.66 | $224.75 | $5,109.17 | $5,043.86 | NO OPT-IN | $5,043.86 |
| Ta Thi Quynh | $10,005.92 | $765.45 | $200.12 | $5,168.53 | $3,871.82 | NO OPT-IN | $3,871.82 |
| Tran Thi Hai | $9,927.01 | $759.42 | $198.54 | $5,180.39 | $3,788.66 | NO OPT-IN | $3,788.66 |
| Pham Thi T. Huyen | $9,926.94 | $759.41 | $198.54 | $5,190.89 | $3,778.10 | NO OPT-IN | $3,778.10 |
| Do Thi Kim Thuy | $9,892.47 | $756.77 | $197.85 | $4,407.32 | $4,530.53 | $4,530.53 | $9,061.05 |
| Vo Thi Quang | $9,923.81 | $759.17 | $198.48 | $5,204.25 | $3,761.91 | NO OPT-IN | $3,761.91 |
| Duong Thi Ha | $9,930.91 | $759.71 | $198.62 | $5,240.11 | $3,732.47 | NO OPT-IN | $3,732.47 |
| Pham Thu Ha | $10,013.97 | $766.07 | $200.28 | $5,625.56 | $3,422.06 | NO OPT-IN | $3,422.06 |
| Pham Thi Ngan | $9,926.94 | $759.41 | $198.54 | $5,105.33 | $3,863.66 | $3,863.66 | $7,727.32 |
| Cao Thi Nga | $9,923.11 | $759.12 | $198.46 | $5,102.85 | $3,862.68 | NO OPT-IN | $3,862.68 |
| Nguyen TK Phuong | $9,957.58 | $761.75 | $199.15 | $5,235.04 | $3,761.63 | NO OPT-IN | $3,761.63 |
| Nguyen Thi Lan | $9,923.11 | $759.12 | $198.46 | $5,128.99 | $3,836.54 | $3,836.54 | $7,673.08 |
| Duong Van Tuan | $9,833.11 | $752.23 | $196.66 | $5,102.85 | $3,781.36 | NO OPT-IN | $3,781.36 |
| Dinh Van Cuong | $9,578.41 | $732.75 | $191.57 | $4,551.28 | $4,102.81 | $4,102.81 | $8,205.63 |
| Pham Thi Luc | $9,892.61 | $756.78 | $197.85 | $4,593.24 | $4,344.73 | $4,344.73 | $8,689.47 |
| Ngo Thanh Hoan | $9,892.47 | $756.77 | $197.85 | $4,685.59 | $4,252.26 | $4,252.26 | $8,504.51 |
| Pham Thi Hai | $9,892.47 | $756.77 | $197.85 | $5,309.88 | $3,627.97 | $3,627.97 | $7,255.93 |
| Nguyen Thi Chien | $9,892.61 | $756.78 | $197.85 | $4,968.36 | $3,969.61 | NO OPT-IN | $3,969.61 |
| Tran Thi Yen | $9,892.47 | $756.77 | $197.85 | $4,745.51 | $4,192.34 | $4,192.34 | $8,384.67 |

188

| TC12 VIETNAMESE WORKERS | Gross Total Earned | FICA Deduction | ASG Tax Deduct. | Total Payments Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| **TC12 Group 4 (cont'd)** | | | | | | | |
| Tran Thi Thu | $9,925.03 | $759.26 | $198.50 | $4,806.81 | $4,160.45 | $4,160.45 | $8,320.90 |
| Nguyen Thi Yen | $9,930.91 | $759.71 | $198.62 | $4,924.37 | $4,048.21 | $4,048.21 | $8,096.41 |
| Le T. T. Huyen | $9,896.30 | $757.07 | $197.93 | $4,888.70 | $4,052.61 | $4,052.61 | $8,105.21 |
| Tran Thi Hong | $9,892.65 | $756.79 | $197.85 | $5,084.68 | $3,853.32 | $3,853.32 | $7,706.65 |
| Hoang Tuyet Hoa | $9,905.88 | $757.80 | $198.12 | $4,267.85 | $4,682.11 | $4,682.11 | $9,364.22 |
| Nguyen Thi Le | $9,992.05 | $764.39 | $199.84 | $5,268.26 | $3,759.56 | NO OPT-IN | $3,759.56 |
| Luong Thi Hang | $9,896.37 | $757.07 | $197.93 | $5,116.03 | $3,825.34 | NO OPT-IN | $3,825.34 |
| Hoang Thi Ngoan | $9,892.68 | $756.79 | $197.85 | $5,273.00 | $3,665.04 | NO OPT-IN | $3,665.04 |
| Giang T. T. Nhan | $9,892.47 | $756.77 | $197.85 | $4,864.98 | $4,072.87 | $4,072.87 | $8,145.73 |
| Do Thi Hai Van | $9,953.89 | $761.47 | $199.08 | $5,249.15 | $3,744.19 | NO OPT-IN | $3,744.19 |
| Le Thi Thu Huong | $9,923.11 | $759.12 | $198.46 | $4,844.33 | $4,121.20 | $4,121.20 | $8,242.40 |
| Dao T. Ngoc Thuy | $9,892.47 | $756.77 | $197.85 | $4,675.69 | $4,262.16 | $4,262.16 | $8,524.31 |
| Nguyen Thi Hai | $9,829.45 | $751.95 | $196.59 | $5,109.17 | $3,771.74 | $3,771.74 | $7,543.48 |
| Le Thi Yen | $10,401.86 | $795.74 | $208.04 | $4,844.33 | $4,553.75 | $4,553.75 | $9,107.50 |
| Ngo Thu Hang | $9,275.84 | $709.60 | $185.52 | $4,675.69 | $3,705.03 | $3,705.03 | $7,410.06 |
| | | | | | | | |
| **TCI2 Group 5** | | | | | | | |
| Bui Thi Hoa | $9,974.08 | $763.02 | $199.48 | $5,149.21 | $3,862.37 | NO OPT-IN | $3,862.37 |
| Pham Thi Hung | $9,913.77 | $758.40 | $198.28 | $5,190.13 | $3,766.96 | NO OPT-IN | $3,766.96 |
| Nguyen Thi Lam | $9,881.14 | $755.91 | $197.62 | $4,909.89 | $4,017.72 | $4,017.72 | $8,035.44 |
| Vu Thi Huong | $10,329.25 | $790.19 | $206.59 | $5,095.85 | $4,236.63 | $4,236.63 | $8,473.25 |
| Truong Thi Hoa | $10,275.70 | $786.09 | $205.51 | $5,266.48 | $4,017.61 | $4,017.61 | $8,035.23 |
| Luyen T.M. Thuy | $9,980.72 | $763.53 | $199.61 | $5,016.73 | $4,000.85 | $4,000.85 | $8,001.70 |
| Nong Thi Nhung | $10,289.04 | $787.11 | $205.78 | $5,098.79 | $4,197.35 | $4,197.35 | $8,394.71 |
| VuThi Nga | $9,816.03 | $750.93 | $196.32 | $4,908.83 | $3,959.95 | $3,959.95 | $7,919.91 |
| Nguyen Thi Hien | $9,891.98 | $756.74 | $197.84 | $5,011.87 | $3,925.53 | $3,925.53 | $7,851.06 |
| Pham Thi Thai | $9,873.48 | $755.32 | $197.47 | $4,858.49 | $4,062.20 | $4,062.20 | $8,124.40 |
| Nguyen Thi Loan | $9,852.42 | $753.71 | $197.05 | $4,954.09 | $3,947.57 | $3,947.57 | $7,895.13 |
| Vu Thi Bien | $9,862.13 | $754.45 | $197.24 | $4,971.04 | $3,939.39 | $3,939.39 | $7,878.79 |
| Pham T.T. Nam | $9,829.44 | $751.95 | $196.59 | $4,832.83 | $4,048.06 | $4,048.06 | $8,096.13 |
| Tran Thi Phuong | $9,896.46 | $757.08 | $197.93 | $5,088.59 | $3,852.86 | $3,852.86 | $7,705.72 |
| Doan Thi H. Thuy | $9,754.89 | $746.25 | $195.10 | $4801.05 | $4,012.49 | $4,012.49 | $8,024.99 |
| Do Thi Van Anh | $10,233.50 | $782.86 | $204.67 | $4,999.33 | $4,246.64 | $4,246.64 | $8,493.27 |
| Vu T. Hoang Hau | $10,009.94 | $765.76 | $200.20 | $5,000.31 | $4,043.67 | $4,043.67 | $8,087.33 |
| | | | | | | | |
| **TCI2 Group 6** | | | | | | | |
| Truong T. Le Quyen | $8,875.26 | $678.96 | $177.51 | $4,284.45 | $3,734.35 | $3,734.35 | $7,468.69 |
| Nguyen Thi Tham | $9,038.04 | $691.41 | $180.76 | $4,539.30 | $3,626.56 | $3,626.56 | $7,253.13 |
| Nguyen T.K. Loan | $9,591.46 | $733.75 | $191.83 | $5,672.06 | $2,993.82 | NO OPT-IN | $2,993.82 |
| Nguyen Le Van | $9,436.03 | $721.86 | $188.72 | $5,241.78 | $3,283.67 | NO OPT-IN | $3,283.67 |
| Duong Thi Huyen | $9,917.35 | $758.68 | $198.35 | $5,636.98 | $3,323.34 | NO OPT-IN | $3,323.34 |
| An Thi Minh | $9,516.79 | $728.03 | $190.34 | $4,980.66 | $3,617.76 | NO OPT-IN | $3,617.76 |
| Dinh Thi Thuy | $9,507.28 | $727.31 | $190.15 | $4,866.27 | $3,723.56 | $3,723.56 | $7,447.11 |
| Doan T. Kim Yen | $9,465.08 | $724.08 | $189.30 | $4,994.69 | $3,557.01 | $3,557.01 | $7,114.02 |
| Phung Thi Lan | $9,241.17 | $706.95 | $184.82 | $4,916.76 | $3,432.63 | $3,432.63 | $6,865.27 |
| Nguyen T.T. Thuy | $9,126.13 | $698.15 | $182.52 | $4,637.66 | $3,607.79 | $3,607.79 | $7,215.59 |
| Nguyen T.K. Dung | $8,926.97 | $682.91 | $178.54 | $4,534.39 | $3,531.12 | $3,531.12 | $7,062.25 |
| Duong Thi Hao | $9,306.14 | $711.92 | $186.12 | $4,597.87 | $3,810.22 | $3,810.22 | $7,620.45 |
| Nguyen Thi Hanh | $9,137.62 | $699.03 | $182.75 | $4,796.07 | $3,459.77 | $3,459.77 | $6,919.53 |
| Juong Thi M. Tam | $9,484.23 | $725.54 | $189.68 | $4,813.71 | $3,755.29 | $3,755.29 | $7,510.58 |

189

| TC12 VIETNAMESE WORKERS | Gross Total Earned | FICA Deduct. | ASG Tax Deduct. | Total Payments Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| **TC12 Group 7** | | | | | | | |
| Tran T. Bich Hoa | $9,366.41 | $716.53 | $187.33 | $4,948.88 | $3,513.67 | $3,513.67 | $7,027.33 |
| Nguyen Thi Lan | $8,795.74 | $672.87 | $175.91 | $4,459.71 | $3,487.24 | $3,487.24 | $6,974.47 |
| Nguyen Thi Thu | $8,600.41 | $657.93 | $172.01 | $4,175.46 | $3,595.01 | $3,595.01 | $7,190.01 |
| Le Thi Van | $9,368.16 | $716.66 | $187.36 | $5,110.59 | $3,353.54 | $3,353.54 | $6,707.08 |
| Nguyen Hai Yen | $9,424.04 | $720.94 | $188.48 | $5,160.79 | $3,353.83 | No Opt-In | $3,353.83 |
| Nguyen Thi Them | $9,393.92 | $718.63 | $187.88 | $5,185.28 | $3,302.12 | No Opt-In | $3,302.12 |
| Nguyen Thi Anh | $9,443.33 | $722.41 | $188.87 | $5,194.57 | $3,337.48 | No Opt-In | $3,337.48 |
| Le Thi Yen | $9,241.93 | $707.01 | $184.84 | $4,934.71 | $3,415.37 | $3,415.37 | $6,830.75 |
| Pham T. X. Huong | $9,438.87 | $722.07 | $188.78 | $4,917.93 | $3,610.09 | $3,610.09 | $7,220.18 |
| Le Thi Kim Thanh | $8,983.73 | $687.26 | $179.67 | $4,726.46 | $3,390.34 | $ 3,390.34 | $6,780.68 |
| Nguyen Thi Thuy | $9,087.83 | $695.22 | $181.76 | $4,874.57 | $3,336.28 | No Opt-In | $3,336.28 |
| Nguyen Thi Lai | $9,527.22 | $728.83 | $190.54 | $5,393.52 | $3,214.32 | No Opt-In | $3,214.32 |
| Banh Thi Ha | $8,866.59 | $678.29 | $177.33 | $4,656.07 | $3,354.89 | $ 3,354.89 | $6,709.79 |
| Ngo Anh Tuyet | $8,565.94 | $655.29 | $171.32 | $4,155.49 | $3,583.83 | $ 3,583.83 | $7,167.66 |
| Nguyen T.H. Hue | $8,937.59 | $683.73 | $178.75 | $5,017.60 | $3,057.51 | No Opt-In | $3,057.51 |
| Tran Thi Thuy | $8,927.87 | $682.98 | $178.56 | $5,028.81 | $3,037.52 | No Opt-In | $3,037.52 |
| Do Thi Anh Tuyet | $8,909.84 | $681.60 | $178.20 | $4,904.12 | $3,145.92 | No Opt-In | $3,145.92 |
| Luu T.P. Hoa | $8,929.93 | $683.14 | $178.60 | $5,056.44 | $3,011.75 | No Opt-In | $3,011.75 |
| Luong T. An Thai | $8,906.98 | $681.38 | $178.14 | $5,059.23 | $2,988.23 | No Opt-In | $2,988.23 |
| Chu Thi Thu | $9,379.05 | $717.50 | $187.58 | $5,110.46 | $3,363.51 | $ 3,363.51 | $6,727.02 |
| Vu Thi Tuyet | $9,335.11 | $714.14 | $186.70 | $5,043.90 | $3,390.37 | No Opt-In | $3,390.37 |
| | | | | | | | |
| **TCI2 Group 8** | | | | | | | |
| Hoan Anh Dung | $10,000.98 | $765.07 | $200.02 | $6,125.14 | $2,910.75 | No Opt-In | $2,910.75 |
| Hoan Q. Thang | $8,288.68 | $634.08 | $165.77 | $3,414.28 | $4,074.54 | No Opt-In | $4,074.54 |
| Nguyen V. Trung | $8,416.04 | $643.83 | $168.32 | $3,744.41 | $3,859.48 | $ 3,859.48 | $7,718.96 |
| | | | | | | | |
| **TCI2 Group 9** | | | | | | | |
| Le Thi Duo | $6,881.30 | $526.42 | $137.63 | $2,656.86 | $3,560.39 | No Opt-In | $3,560.39 |
| Bui Thi Huyen | $6,929.18 | $530.08 | $138.58 | $2,599.04 | $3,661.47 | $ 3,661.47 | $7,322.94 |
| | | | | | | | |
| **TC12 Group 10** | | | | | | | |
| Pham Thi Thu Nga | $3,589.45 | $274.59 | $71.79 | $659.27 | $2,583.80 | No Opt-In | $2,583.80 |
| Hoang T. Thu Thuy | $3,521.20 | $269.37 | $70.42 | $659.27 | $2,522.13 | $2,522.13 | $5,044.27 |
| Bui Thi Ut | $3,521.20 | $269.37 | $70.42 | $659.27 | $2,522.13 | $2,522.13 | $5,044.27 |
| Nguyen Thi Tuyet | $3,529.00 | $269.97 | $70.58 | $699.39 | $2,489.06 | $2,489.06 | $4,978.12 |
| Bui T Phuong Lan | $3,521.20 | $269.37 | $70.42 | $659.27 | $2,522.13 | No Opt-In | $2,522.13 |
| Vu Thi Ha | $3,521.20 | $269.37 | $70.42 | $645.45 | $2,535.95 | No Opt-In | $2,535.95 |
| Mai Thi Oahn | $3,653.80 | $279.52 | $73.08 | $701.11 | $2,600.10 | No Opt-In | $2,600.10 |
| Ninh Thi Chung | $3,653.80 | $279.52 | $73.08 | $714.93 | $2,586.28 | No Opt-In | $2,586.28 |
| Bui T. T. Bang | $3,521.20 | $269.37 | $70.42 | $645.45 | $2,535.95 | $2,535.95 | $5,071.91 |
| Hoang Thi Giang | $3,521.20 | $269.37 | $70.42 | $659.27 | $2,522.13 | $2,522.13 | $5,044.27 |
| Duong Thi Tam | $3,595.30 | $275.04 | $71.91 | $659.27 | $2,589.08 | No Opt-In | $2,589.08 |
| Duong Thi Thom | $3,521.20 | $269.37 | $70.42 | $656.92 | $2,524.48 | No Opt-In | $2,524.48 |
| Nguyen Thi Hien | $3,529.00 | $269.97 | $70.58 | $708.60 | $2,479.85 | $2,479.85 | $4,959.70 |
| Nguyen T. T Huong | $3,521.20 | $269.37 | $70.42 | $774.83 | $2,406.57 | $2,406.57 | $4,813.15 |
| Le Phi M. Phuong | $3,521.20 | $269.37 | $70.42 | $659.27 | $2,522.13 | $2,522.13 | $5,044.27 |
| Nguyen T. Huyen | $3,521.20 | $269.37 | $70.42 | $620.69 | $2,560.71 | $2,560.71 | $5,121.43 |
| Nguyen Thi Luan | $3,521.20 | $269.37 | $70.42 | $659.27 | $2,522.13 | $2,522.13 | $5,044.27 |
| Nguyen T. T. Mai | $3,521.20 | $269.37 | $70.42 | $595.03 | $2,586.37 | $2,586.37 | $5,172.75 |
| Dao T. Hong Van | $3,521.20 | $269.37 | $70.42 | $634.62 | $2,546.78 | No Opt-In | $2,546.78 |

190

| TC12 VIETNAMESE WORKERS | Gross Total Earned | FICA Deduct. | ASG Tax Deduct. | Total Payments Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| **TC12 Group 11** | | | | | | | |
| Mai T. Hong Phuc | $3,454.30 | $264.25 | $69.09 | $659.27 | $2,461.69 | No Opt-In | $2,461.69 |
| Le Thi Thien | $3,540.10 | $270.82 | $70.80 | $651.05 | $2,547.43 | No Opt-In | $2,547.43 |
| Nguyen Thi Luyen | $3,454.30 | $264.25 | $69.09 | $659.27 | $2,461.69 | No Opt-In | $2,461.69 |
| Hoang Thi Ha | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Pham Thi Van | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Le Thi Hoai | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Nguyen Thi Hoa | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Le Thi Cuc | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Nguyen Le Hoan | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Nguyen Le Ngoc | $3,419.20 | $261.57 | $68.38 | $657.11 | $2,432.14 | $2,432.14 | $4,864.27 |
| Nguyen Thi Van | $3,419.20 | $261.57 | $68.38 | $654.67 | $2,434.58 | $2,434.58 | $4,869.15 |
| Nguyen Thi Thuy | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | No Opt-In | $2,429.98 |
| Tran Thi Phuong | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Le Thi Chi Lan | $3,427.00 | $262.17 | $68.54 | $714.65 | $2,381.64 | $2,381.64 | $4,763.29 |
| Nguyen Thi Hong | $3,419.20 | $261.57 | $68.38 | $603.98 | $2,485.27 | $2,485.27 | $4,970.53 |
| Nguyen Thi Thao | $3,423.10 | $261.87 | $68.46 | $656.97 | $2,435.80 | $2,435.80 | $4,871.60 |
| Dang Thi Oanh | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | No Opt-In | $2,429.98 |
| Nguyen L. Huong | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Ngo Thi Vinh | $3,419.20 | $261.57 | $68.38 | $650.06 | $2,439.19 | No Opt-In | $2,439.19 |
| Pham Yen Ly | $3,427.00 | $262.17 | $68.54 | $695.87 | $2,400.42 | $2,400.42 | $4,800.85 |
| Luu Thi Thuy | $3,423.10 | $261.87 | $68.46 | $669.84 | $2,422.93 | $2,422.93 | $4,845.86 |
| Vu Thi Thanh | $3,427.00 | $262.17 | $68.54 | $790.53 | $2,305.76 | No Opt-In | $2,305.76 |
| | | | | | | | |
| **TC12 Group 12** | | | | | | | |
| Nguyen Thi Phan | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | No Opt-In | $2,429.98 |
| Tran T. K. Thanh | $3,419.20 | $261.57 | $68.38 | $674.54 | $2,414.71 | No Opt-In | $2,414.71 |
| Ta Thi Thuy Ngan | $3,544.00 | $271.12 | $70.88 | $659.27 | $2,542.73 | No Opt-In | $2,542.73 |
| Vu Thi Thom | $3,471.85 | $265.60 | $69.44 | $659.27 | $2,477.55 | No Opt-In | $2,477.55 |
| Nguyen Thi Hang | $3,462.10 | $264.85 | $69.24 | $659.27 | $2,468.74 | $2,468.74 | $4,937.47 |
| Tran T. T. Tam | $3,544.00 | $271.12 | $70.88 | $659.27 | $2,542.73 | No Opt-In | $2,542.73 |
| Pham Thi Ngan | $3,540.10 | $270.82 | $70.80 | $659.27 | $2,539.21 | $2,539.21 | $5,078.42 |
| Doan P. C. Tuong | $3,553.39 | $271.83 | $71.07 | $935.45 | $2,275.04 | $2,275.04 | $4,550.08 |
| Vu T. Kim Thanh | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |
| Nguyen Thi Hoai | $3,419.20 | $261.57 | $68.38 | $659.27 | $2,429.98 | $2,429.98 | $4,859.95 |

4. Independent Vietnamese Workers. Daewoosa Samoa, and Lee are jointly and severally liable to remunerate the independent Vietnamese workers listed back wages and an equal amount as liquidated damages as indicated in the "Total Owed to the Independent Workers" column in the following table. In addition, Daewoosa Samoa, and Lee shall pay the applicable federal and ASG government agencies the amounts deducted from each independently recruited Vietnamese workers' earned income respectively for FICA withholdings and ASG taxes, except for those amounts already paid during the Spring of 2000.

191

| INDEPENDENT VIETNAMESE WORKERS | Gross Total Earned | FICA Deduct. | ASG Tax Deduct. | Total Payments Received | Total Back Wages | FLSA Liquidated Damages | Total Owed to Workers |
|---|---|---|---|---|---|---|---|
| Ha Thi Huong | $7,030.00 | $537.80 | $140.60 | $3,208.57 | $3,143.04 | $3,143.04 | $6,286.07 |
| Tran Thi Thu | $6,985.96 | $534.43 | $139.72 | $3,159.78 | $3,152.03 | $3,152.03 | $6,304.06 |
| Ngo Thi Tiep | $7,037.66 | $538.38 | $140.75 | $3,222.40 | $3,136.13 | $3,136.13 | $6,272.25 |
| Ngo Thi Nguyen | $7,114.50 | $544.26 | $142.29 | $3,208.57 | $3,219.38 | NO OPT-IN | $3,219.38 |
| Tran Thi Phuong | $7,118.33 | $544.55 | $142.37 | $3,210.12 | $3,221.29 | $3,221 29 | $6,442.58 |
| Mai Thi Thuy | $5,766.00 | $441.10 | $115.32 | $6,243.19 | $ 0.00 | NO OPT-IN | $ 0.00 |

B. Class-wide Back Wages

*1. IMS Group 1.* Daewoosa Samoa, Lee, and IMS are jointly and severally liable to pay each IMS-recruited Vietnamese worker, not listed above, that arrived in American Samoa on February 8, 1999 back wages in the amount of $4,847.88. In addition, Daewoosa Samoa, Lee, and IMS shall pay the applicable federal government agency the amount of $967.01, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 1 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and IMS shall pay the applicable ASG agency the amount of $252.98, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 1 worker's income to pay his or her ASG taxes.

*2. IMS Group 2.* Daewoosa Samoa, Lee, and IMS are jointly and severally liable to pay each IMS-recruited Vietnamese worker, not listed above, that arrived in American Samoa on March 8, 1999, back wages in the amount of $4,590.97. In addition, Daewoosa Samoa, Lee, and IMS shall pay the applicable federal government agency the amount of $894.96, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 2 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and IMS shall pay the applicable ASG agency the amount of $233.98, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 2 worker's income to pay his or her ASG taxes.

*3. IMS Group 3.* Daewoosa Samoa, Lee, and IMS are jointly and severally liable to pay each IMS-recruited Vietnamese worker, not listed above, that arrived in American Samoa on May 14, 1999, back wages in the amount of $3,622.61. In addition, Daewoosa Samoa, Lee, and IMS shall pay the applicable federal government agency the amount of $841.05, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 3 worker's income to pay his or her FICA contributions.

Also, Daewoosa Samoa, Lee, and IMS shall pay the applicable ASG

192

agency the amount of $219.88, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 3 worker's income to pay his or her ASG taxes.

*4. IMS Group 4.* Daewoosa Samoa, Lee, and IMS are jointly and severally liable to pay each IMS-recruited Vietnamese worker, not listed above, that arrived in American Samoa on June 12, 1999, back wages in the amount of $3,237.37. In addition, Daewoosa Samoa, Lee, and IMS shall pay the applicable federal government agency the amount of $789.68, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 4 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and IMS shall pay the applicable ASG agency the amount of $206.45, minus any amount paid during the Spring of 2000, as monies deducted from each IMS group 4 worker's income to pay his or her ASG taxes.

*5. TC12 Group 1.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each-TC12 recruited Vietnamese worker, not listed above, that arrived in American Samoa on July 15, 1999, back wages in the amount of $3,320.32. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $741.68, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 1 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $193.90, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 1 worker's income to pay his or her ASG taxes.

*6. TC12 Group 2.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on July 19, 1999, back wages in the amount of $3,507.06. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $726.82, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 2 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $190.02, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 2 worker's income to pay his or her ASG taxes.

*7. TC12 Group 3.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on July 22, 1999, back wages in the amount of $3,554.20. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $720.75, minus any amount paid during the Spring of 2000, as monies

deducted from each TC12 group 3 worker's income to pay his or her FICA contributions. Also Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $188.43, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 3 worker's income to pay his or her ASG taxes.

*8. TC12 Group 4.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on July 19, 1999, back wages in the amount of $3,936.98. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $756.79, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 4 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $197.85, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 4 worker's income to pay his or her ASG taxes.

*9. TC12 Group 5.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on August 3, 1999, back wages in the amount of $4,008.11. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $763.49, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 5 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $199.60, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 5 worker's income to pay his or her ASG taxes.

*10. TC12 Group 6.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on August 10, 1999, back wages in the amount of $3,532.64. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $713.47, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 6 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $186.31, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 6 worker's income to pay his or her ASG taxes.

*11. TC12 Group 7.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay' each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on August 24, 1999 back wages in the amount of $3,325.85. In addition, Daewoosa Samoa, Lee,

and TC12 shall pay the applicable federal government agency the amount of $697.35, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 7 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $182.31, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 7 worker's income to pay his or her ASG taxes.

12. *TC12 Group 8.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on October 1, 1999, back wages in the amount of $3,614.92. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $681.00, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 8 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $178.04, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 8 worker's income' to pay his or her ASG taxes.

13. *TC12 Group 9.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on October 1, 1999, back wages in the amount of $3,610.93. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $528.25, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 9 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $138.10, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 9 worker's income to pay his or her ASG taxes.

14. *TC12 Group 10.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not listed above, that arrived in American Samoa on May 18, 2000, back wages in the amount of $2,534.62. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $271.08, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 10 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $70.87, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 10 worker's income to pay his or her ASG taxes.

15. *TC12 Group 11.* Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to pay each TC12-recruited Vietnamese worker, not

listed above, that arrived in American Samoa on May 25, 2000, back wages in the amount of $2,439.34. In addition, Daewoosa Samoa, Lee, and TC12 shall pay the applicable federal government agency the amount of $263.54, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 11 worker's income to pay his or her FICA contributions. Also, Daewoosa Samoa, Lee, and TC12 shall pay the applicable ASG agency the amount of $68.90, minus any amount paid during the Spring of 2000, as monies deducted from each TC12 group 11 worker's income to pay his or her ASG taxes.

C. Other Vietnamese Workers Entitled to FLSA Liquidated Damages

A number of Vietnamese workers affirmatively opted-in to the FLSA suit by either being a named plaintiff in the lawsuit, or signing the January 17, 2001 consent to FLSA litigation, but were listed more than once, or not listed at all on the Daewoosa Samoa provided payroll summaries.

Apparently, some of the opted-in Vietnamese workers were named more than once in the summaries because more than one worker with the same name existed. This makes it impossible for the court to decipher which Vietnamese workers opted-in, and, therefore, entitled to FLSA liquidated damages amongst those workers who share the same name with other co-workers. Thus, within 50 days from the date this opinion and order is entered, those workers who opted-in the FLSA litigation by either being a named plaintiff in the complaint or executing the January 17, 2001 consent, but who share the same name with other Vietnamese workers must file proof with the Court that they are, indeed, either the named, or consenting worker listed, and are, therefore, entitled to liquidated damages in an amount equal to owed back-wages. Without such proof, those opted-in Vietnamese workers with duplicative names shall not be entitled to liquidated damages. Those opted-in Vietnamese workers with duplicative names, who are named plaintiffs, include: Nguyen Thi Thuy, and Nguyen Thi Anh. Additional opted-in Vietnamese workers with duplicative names, who signed the January 17, 2001 consent to FLSA litigation include: Nguyen Thi Tuyet, Le Thi Yen, Tran Thi Phuong, Pham Thi Ngan, and Nguyen Thi Hien.

In addition, some of the Vietnamese workers who opted-in to the FLSA litigation were not listed at all on the payroll summaries provided by Daewoosa Samoa. These workers, who are entitled to class-wide back wages as listed above, are also entitled to liquidated damages in an amount equal to owed back wages. These unlisted opted-in Vietnamese workers, who are named plaintiffs, include: Le Thi Thanh Thuy, Pham Van Liem, Hoang Van Tai, Nguyen Thuy, Noang Thi Hang, Giang Thi Thanh Nhan, and Ngo Van Thu. Additional unlisted opted-in Vietnamese workers, who signed the January 17, 2001 consent to litigation include:

Trinh Thi Danh, Cu Thi Minh Thien, An Thu Minh, Ngo Thi Oinh, and Hang Thu Ngo.

D. Other Class-wide Damage

1. Daewoosa Samoa, Lee, IMS, and TC12 shall reimburse the Chinese workers and Vietnamese workers for charging them illegal initial fees as follows: a) Daewoosa Samoa and Lee are jointly and severally liable to reimburse each member of the Chinese workers' class $7,683.00; b) Daewoosa Samoa, Lee and IMS are jointly and severally liable to reimburse each member of the IMS recruited Vietnamese workers' class $3,000.00; c) Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to reimburse each member of the TC12 recruited Vietnamese workers' class $4,000.00; and d) Daewoosa Samoa and Lee are jointly and severally liable to reimburse each member of the independently recruited Vietnamese workers' class $5,000.

2. Daewoosa Samoa, Lee, IMS, and TC12 shall compensate the Chinese workers, and the Vietnamese workers for providing them substandard room and board as follows: a) Daewoosa Samoa and Lee are jointly and severally liable to reimburse each Chinese worker, and each independently recruited Vietnamese worker $1,500.00; b) Daewoosa Samoa, Lee, and IMS are jointly and severally liable to reimburse each IMS recruited Vietnamese worker $1,500.00; and c) Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to reimburse each TC12 recruited Vietnamese worker $1,500.00.

3. Daewoosa Samoa, Lee, IMS, and TC12 shall compensate the Chinese workers and Vietnamese workers for illegally withholding the passports and identification cards as follows: a) Daewoosa Samoa, and Lee are jointly and severally liable to reimburse each Chinese worker, and independently recruited Vietnamese worker $1,000.00; b) Daewoosa Samoa, Lee, and IMS are jointly and severally liable to reimburse each IMS recruited Vietnamese worker $1,000.00; and c) Daewoosa Samoa, Lee, and TC12 are jointly and severally liable to reimburse each TC12 recruited Vietnamese worker $1,000.00.

D. TC12's Cross Claim

TC12's cross-claim against Daewoosa Samoa and Lee for indemnification is denied.

E. Attorneys Fees and Costs

Daewoosa Samoa, and Lee are jointly and severally liable to pay the reasonable attorney's fees and costs of the Chinese workers in the

amount of $25,000. Likewise, Daewoosa Samoa, Lee, IMS, and TC12 are jointly and severally liable to pay the reasonable attorney's fees and costs of the Vietnamese workers in the amount of $75,000.

It is so ordered.